# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49492-2-II |
| Respondent, | Consolidated with<br>No. 49499-0-II<br>No. 49519-8-II |
| v. | No. 49512-1-II<br>No. 49509-1-II |
| JOHN ALLEN BOOTH, JR., | No. 49502-3-II |
| Appellant. | UNPUBLISHED OPINION |

MELNICK, J. — John Booth appeals the denial of his motion to vacate his convictions, which he based on allegations that the State overheard protected attorney-client communications and used them against him. After a hearing on Booth's motion, the trial court found that Booth had received a fair trial and denied his motion. Booth also appeals from the court's ruling that vacated some, but not all, of his outstanding legal financial obligations (LFOs). He makes numerous arguments in support of his position.

We affirm.

## FACTS

### I.    CONVICTION

In 2010, Booth shot four people while attempting to collect a drug debt. Three of the victims died. After the shooting, Booth fled to Spokane where the police later found him. Booth awaited trial at the Lewis County Jail. While there, the police listened to a call made by Booth to his friend in Spokane. Through the call, the police were able to locate the murder weapon.

A jury convicted Booth of two counts of murder in the first degree, one count of murder in the second degree, one count of attempted murder in the first degree, one count of attempted extortion in the first degree, and one count of unlawful possession of a firearm in the first degree. He appealed, and we affirmed his convictions.

II.  MOTION TO VACATE

Booth then filed a motion to either vacate and dismiss the judgment and sentence or hold an evidentiary hearing. He filed the motion pursuant to CrR 7.8. Booth alleged that the State engaged in a pattern of eavesdropping during the preparation of his murder trial which intruded into his attorney-client communications. The trial court scheduled a hearing.

A.  Motion to Compel

Prior to the hearing, but after being appointed counsel, Booth filed a motion to compel the State to produce telephone records in its possession.[1] Booth alleged the State had documents that would show it had a blanket policy of listening to inmates' attorney-client phone conversations or, at the least, had a plan to listen to his attorney-client conversations. Booth requested, among other documents, "every document with [his] name anywhere in it in the possession of any branch of the law enforcement of [L]ewis [C]ounty  or state controlled agency related to [his motion] in any way." Clerk's Papers (CP) at 243.

The court held a hearing on the motion to compel, but Booth was not present. At the hearing, the State argued that it had given Booth all relevant documents in its possession as part of discovery and that the jail had fully responded to Booth's Public Records Act (PRA) request. Booth presented no additional evidence.

---

[1] Although Booth personally filed the motion, it appears that his lawyer adopted it. The lawyer argued the motion.

At one point in the hearing, the court asked Booth's attorney whether Booth could identify any specific "items of discovery . . . with sufficient particularity that [the court] could actually direct the jail in the event that [it] found [Booth] was correct." 1 Report of Proceedings (RP) at 11. Booth's attorney responded that Booth "maintains that there is going to be some sort of documentation or meeting between staff members that they either collaborated or conspired with one another to listen to his conversations with his attorney." 1 RP at 11. The court denied Booth's motion.

B.      Evidentiary Hearing[2]

Booth alleged four separate instances of misconduct to support his motion to vacate. First, he alleged that the State listened to telephone calls he had with his attorney and those he had with his private investigator. Second, he alleged that jail staff and detectives listened to attorney-client conversations that occurred in the visitation rooms. Third, he alleged that a detective sat behind him in court and listened to attorney-client conversations that occurred there. And fourth, he alleged that a correctional officer (CO) overheard attorney-client conversations in a courthouse conference room.

1.      Jail's Phone System

The Lewis County Jail detained Booth for approximately 16 months. During that time, Global Tel Link (GTL) operated the jail's inmate phone system. A sign posted above the phone in the jail indicated that phone calls were monitored. However, GTL did not record known attorney-client phone calls. Lawyers provided their phone numbers to the jail. Jail staff then

---

[2] The court entered findings of fact and conclusions of law. Because Booth challenges many of them, we include the relevant evidence presented.

inputted the numbers and GTL did not record any calls from those numbers. Booth's attorney at the time of his murder trial did not regularly practice in Lewis County.

At one point, CO Jack Haskins, whose job was to listen in on all recorded inmate phone calls, inadvertently overheard a conversation between Booth and his attorney. He did not intend to listen to any of Booth's attorney-client conversations. However, while listening to a call, the subject matter started "going towards legal questions, legal manner." 2 RP at 352. At that point, Haskins stopped listening and told his supervisor. He did not tell his supervisor the content of the conversation. The supervisor told Haskins to tell Booth what happened, which he did. Additionally, Haskins asked Booth to clarify what numbers Booth needed added to the attorney list.

Haskins did not tell anyone about the incident except Booth and his supervisor. No detective or prosecutor assigned to Booth's murder case had knowledge that Haskins overheard a phone call between Booth and his attorney.

Additionally, during his time at the jail, Booth lodged grievances alleging that the jail was improperly monitoring his phone calls to John Wickert,[3] the private investigator assisting his lawyer. The problem arose because Wickert ran both a bail bond company and a private investigation company. Booth would sometimes call the phone number associated with Wickert's bail bond company when he could not reach Wickert on the private investigation phone number. Initially, the jail refused to add the bail bond phone number to the do-not-record list. No detective or prosecutor assigned to Booth's case knew the jail heard any of Booth's conversations with Wickert or any of the substance of those conversations.

---

[3] Wickert did not testify at Booth's hearing.

At one point during the hearing, Booth attempted to introduce a document that appeared to indicate which conversations of his the jail recorded and monitored; he obtained the document from a PRA request. The State objected, arguing that the document was inadmissible because it had not been properly authenticated by a custodian of GTL. The court sustained the objection.

### 2. Jail's Visitation Rooms

During Booth's detention, the Lewis County Jail did not have completely soundproof attorney-client visitation rooms. At one point, a local attorney knocked on Booth's visitation room while Booth was meeting with his attorney to tell them that he could hear them. Based on complaints, the jail began making improvements. It appears some of the improvements occurred while Booth was detained at the jail.

According to the COs who transported Booth from his cell to meet with his lawyer, they secured him in the visitation room and then stood in the hallway adjacent to the room. On one occasion, CO Vernon West heard Booth say "that he did kill the kid and the kid had a gun." 1 RP at 101. After hearing the statement, he and the other transport CO "immediately moved away." 1 RP at 102. On subsequent meetings between Booth and his attorney, West stood at the end of the hall. Booth could see the COs if he turned around while in the visitation room.

CO Curtis Lamping also heard Booth tell his lawyer something like, "The guy had the gun, so I had to shoot him." 1 RP at 181. After hearing the statement, Lamping moved to the other end of the hall so he would not be able to hear Booth.

According to West and Lamping, Booth seemed to speak particularly loud when he made the statements that they overheard.

Neither West nor Lamping intended to listen to Booth's conversations. They also did not convey the substance of the conversation to anyone besides their fellow transport COs. No other transport CO remembered learning that West or Lamping overheard Booth's conversations.

Roger Hunko, Booth's lawyer during his murder trial, did not know that Booth had concerns about his representation based on the fact that COs potentially overheard conversations in the visitation rooms. Additionally, Hunko felt that he could communicate freely with Booth regarding his murder trial, and jail conditions did not affect his trial strategy.

### 3. Detective's Presence in Courtroom

Daniel Riordan, a detective on Booth's murder trial, worked as extra security in the courtroom during Booth's court appearances. Riordan's supervisor told him to sit in the pew directly behind Booth.

At one point during a pretrial hearing, Booth accused Riordan of listening to his attorney-client conversations. Booth informed the court of his concerns, and the court excluded Riordan from the courtroom. After the incident, Riordan no longer worked as extra security in the courtroom.

At no point during his time as security did Riordan overhear or intend to overhear conversations between Booth and his lawyer. He also did not see any notes written by Booth or his attorney.

4. Court Conference Room

On one occasion when West transported Booth to court, the court gave Booth and his attorney a conference room to meet. During the meeting, West sat in the room on the far side.[4] According to Hunko, West's presence or the fact that he could potentially overhear their conversation did not affect his trial strategy.

5. Jail Policy

Lewis County had a policy that COs were not to actively listen in on attorney-client conversations.

No jail supervisor ever instructed a CO to listen to conversations between inmates and attorneys, or between Booth and his attorney. Besides the COs who directly overheard Booth's attorney-client conversations, no one knew the contents of any of Booth's conversations with his attorneys.

6. Excluding Booth's Testimony

At one point during the hearing, Booth was asked whether he had lost faith in his attorney during the preparation of his murder trial because of the State's intrusions into his attorney-client communications. The State objected, and the court sustained the objection as irrelevant. The court continued, discussing it had knowledge of discord between Booth and Hunko during his murder trial, evidenced by the bar complaint that Booth had filed.

---

[4] Neither party asked questions of West related to this incident. However, West testified that, aside from the incident in which he overheard Booth's conversation in the attorney-client visitation room, he did not learn anything else between Booth and his attorneys that he shared with anyone. He also actively avoided hearing inmates' conversations with their attorneys.

7.      Findings of Fact and Conclusions of Law

At the conclusion of the evidence, the court denied Booth's motion. It then entered the following relevant findings of fact:

1.1.    There was no pattern of eavesdropping on conversations between the defendant and his attorney.
. . . .
1.5.    After Mr. Booth was placed in the attorney visitation booth, the corrections staff would proceed down the hallway so that the inmate side of the interview room was still in view.
. . . .
1.7.    On the two occasions where corrections staff inadvertently overheard Mr. Booth yell to his lawyer, they immediately took steps to distance themselves away from the attorney/client booths where the conversations took place.
1.8.    Lewis County corrections staff were never instructed, either by their own command staff, a detective assigned to the case, or the prosecutor's office, to eavesdrop on conversations between Mr. Booth and his lawyer.
1.9.    No communication between Mr. Booth and his lawyer that may have been inadvertently heard by corrections staff was ever passed on to jail command staff, law enforcement, the criminal investigation side of the sheriff's office, or the prosecutor's office.
1.10.   The members of the corrections staff doing transport of Mr. Booth had what the court referred to as a "self-imposed gag order" on any communication between Mr. Booth and his lawyer that might have been inadvertently overheard by transport officers.
. . . .
1.14.   There was nothing done intentionally, by anyone in the Lewis County corrections staff, law enforcement, or the prosecutor's office, to unlawfully compromise Mr. Booth's defense of his case.
. . . .
1.16.   Mr. Booth's assertion that he was intimidated or lost confidence in Mr. Hunko due to the condition of the attorney visitation booths was not supported by Mr. Hunko's testimony.
1.17.   It is not beyond the scope of the court's imagination that Mr. Booth may have deliberately raised his voice when speaking with his lawyer, with the intention of raising the issue of the lack of soundproofing of the attorney visitation booths on appeal.
. . . .
1.19.   If a defense attorney gives the jail his/her phone number, that number is blocked in the jail phone call system so it cannot be recorded or intercepted.
. . . .

8

1.22. Officer Haskins did not report to anyone the content of [Booth's] phone call. Officer Haskins did not report the call to the law enforcement side of the Sheriff's office, the detectives, or the prosecutor's office.

. . . .

1.26. Officer West did not overhear any of the conversation between Mr. Hunko and Mr. Booth while he was in the conference room in the courthouse with Mr. Hunko and Mr. Booth.

. . . .

1.29. At no time did Mr. Hunko express to the court that he felt, in any way, that his ability to represent Mr. Booth thoroughly and completely in the court of this case was impacted as a result of corrections staff being in the conference room with him and his client.

CP at 352-56. The court concluded that Booth received a fair trial and was not denied due process.

C.     Motion to Expand the Record

A few months after the hearing, the court held a hearing that addressed, among other motions, Booth's motion to expand the record from the evidentiary hearing. Booth asked the court to include in the record a jail handbook indicating that "calls to your attorneys will not be recorded." 3 RP at 589.

The court denied the motion stating that sufficient testimony offered at the hearing already established that the jail did not record known attorney-client calls. Booth contested the court's characterization of the testimony. The court replied to Booth, stating, "[Y]our claims as to what actually happened and what the evidence showed are not accurate." 3 RP at 595.

D.     Motion to Vacate LFOs

Booth also filed a motion to vacate his outstanding LFOs. The State agreed that it could not collect from Booth's 1996, 1998, and 1999 cause numbers. The court then signed orders stating that the State's ability to collect on these cases had expired. The court also vacated all discretionary LFOs from Booth's 2003, 2004, and 2010 cases.

9

Booth argued that because he could only make, at most, $15 per month while he was incarcerated and because he would be incarcerated the rest of his life, the remaining mandatory LFOs violated his rights under the Eighth Amendment to the United States Constitution. The court rejected his argument. Booth appeals.

ANALYSIS

I.      RIGHT TO COUNSEL AND DUE PROCESS

Booth argues that the eavesdropping by the jail staff violated his rights to counsel and to due process. Booth assigns error to numerous findings of fact, contending that substantial evidence does not support the findings. Additionally, Booths argues that the court's findings do not support its conclusion. We disagree.

A.      Legal Principles

We review a trial court's decision on a CrR 7.8 motion for an abuse of discretion. *State v. Smith*, 159 Wn. App. 694, 699, 247 P.3d 775 (2011). We review a trial court's factual findings for substantial evidence. *State v. Ieng*, 87 Wn. App. 873, 877, 942 P.2d 1091 (1997). Substantial evidence is a sufficient quantity of evidence to persuade a rational, fair-minded person that a finding is true. *State v. Schultz*, 170 Wn.2d 746, 753, 248 P.3d 484 (2011). Unchallenged findings of fact are verities on appeal. *State v. Pippin*, 200 Wn. App. 826, 834, 403 P.3d 907 (2017). We defer to the trial court on credibility issues. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

We review a trial court's conclusions of law de novo to see if they are supported by the findings. *Ieng*, 87 Wn. App. at 877.

A defendant's right to counsel is protected by the United States and Washington constitutions. U.S. CONST. amend. V, VI; WASH. CONST. art. I, § 22. Intrusion into private attorney-client communications violates a defendant's right to effective representation and due process. *State v. Cory*, 62 Wn.2d 371, 374-75, 382 P.2d 1019 (1963). When the State eavesdrops on a defendant's attorney-client privileged communication, we presume prejudice. *State v. Peña Fuentes*, 179 Wn.2d 808, 819-20, 318 P.3d 257 (2014). However, this presumption is rebuttable by the State if it can "show beyond a reasonable doubt that the defendant was not prejudiced." *Peña Fuentes*, 179 Wn.2d at 820.

B.      Substantial Evidence Supports the Challenged Findings

Booth challenges approximately 13 of the court's findings of fact on the basis that substantial evidence does not support them. We have reviewed the record and disagree with Booth. Substantial evidence supports the challenged findings.

Booth also assigns error to seven additional findings of fact; however, he does not provide argument as to why these findings are deficient. RAP 10.3(a)(6). We conclude that these findings are verities. *Pippin*, 200 Wn. App. at 834.

C.      Findings Support the Court's Conclusions

Booth's argument on how the trial court misapplied the law is not entirely clear. It appears that Booth is arguing that the State's intrusion does not have to be intentional to raise the rebuttable presumption of prejudice, and thus, the State must prove harmlessness beyond a reasonable doubt even if it only inadvertently overheard attorney-client communications. We conclude that, regardless of Booth's inadvertence argument, the State did in fact carry its burden and that the trial court's conclusions are supported by its findings.

Here, the court found that when Booth and Lamping overheard Booth's conversation in the visitation room, they immediately distanced themselves. It also found that West, Lamping, and the other transport COs had a "self-imposed gag order" where they would not and did not share any information inadvertently overheard. CP at 354. Haskins similarly did not share the content of the attorney-client telephone call that he inadvertently overheard. The court also found that West did not overhear anything while he was in the courthouse conference room with Booth and Hunko. Finally, "[n]o communication between Mr. Booth and his lawyer that may have been inadvertently heard by corrections staff was ever passed on to jail command staff, law enforcement, the criminal investigation side of the sheriff's office, or the prosecutor's office." CP at 353.

Therefore, we conclude that the trial court's findings support the conclusion that Booth was not prejudiced.[5]

Based on all of the above, we conclude that substantial evidence supports the trial court's findings and that its findings support its conclusion that no violation of Booth's right to effective representation or due process occurred.

II.      MOTION TO COMPEL

Booth argues that the trial court abused its discretion when it denied his motion to compel, which sought various evidence. We disagree.[6]

---

[5] Because we conclude that the State showed beyond a reasonable doubt that Booth was not prejudiced, we do not decide whether the inadvertent overhearing of confidential attorney-client communications is a Sixth Amendment violation. Booth argues in the alternative that we should remand this issue to the trial court for additional fact finding. Because of our resolution of this issue, we disagree with Booth.

[6] We reject the State's argument that we should not consider Booth's argument based upon his failure to accurately cite the record.

CrR 4.7 governs criminal discovery. However, "prisoners seeking postconviction relief are not entitled to discovery as a matter of ordinary course, but are limited to discovery only to the extent the prisoner can show good cause to believe the discovery would prove entitlement to relief." *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 391, 972 P.2d 1250 (1999).

We review a trial court's denial of a motion to compel discovery for an abuse of discretion. *State v. Norby*, 122 Wn.2d 258, 268, 858 P.2d 210 (1993). A trial court abuses its discretion when it decides a matter on untenable grounds or reasons, or when no reasonable judge would have reached the same conclusion. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012); *State v. Lusby*, 105 Wn. App. 257, 262, 18 P.3d 625 (2001).

Here, Booth's motion sought a voluminous amount of records, including "every document with [his] name anywhere in it in the possession of any branch of the law enforcement of [L]ewis [C]ounty or state controlled agency related to [his CrR 7.8 motion] in any way." CP at 243. The State responded that it had provided all relevant documents.

At a hearing on the motion, the court asked Booth whether he could identify specific "items of discovery . . . with sufficient particularity that [the court] could actually direct the jail in the event that [it] found [Booth] was correct." 1 RP at 11. Booth could not comply with the court's request.

Given the broad scope of Booth's request, coupled with his inability to refine his request, we conclude that the trial court did not abuse its discretion in denying Booth's motion to compel.

III.    EXCLUDING BOOTH'S PROFFERED EVIDENCE

Booth argues that the trial court abused its discretion when it prevented him from testifying about his lack of confidence in his attorney. We disagree.

13

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Relevant evidence is generally admissible. ER 402. Yet, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

Here, it seems clear that the trial court viewed Booth's proposed testimony, indicating he had lost faith in his attorney during the preparation of his murder trial, as the "needless presentation of cumulative evidence." ER 403. It recognized that Booth had filed a bar complaint against Hunko, and it was aware that Booth had been unsatisfied with Hunko's representation. Viewing the totality of testimony, we conclude that the trial court did not abuse its discretion in limiting Booth's testimony.

IV.     MOTION TO EXPAND THE RECORD

Booth argues that his post-hearing request to expand the record, made months after the evidentiary hearing, amounted to a motion to reopen the case and that the trial court abused its discretion in denying his motion. We disagree.

"Generally, the issue of whether to allow a party to reopen its case to present further evidence is a matter within the discretion of the trial court." *State v. Brinkley*, 66 Wn. App. 844, 848, 837 P.2d 20 (1992). "A trial court's actions in regard to reopening of a case will be upheld except upon a showing of manifest abuse of discretion and prejudice resulting to the complaining party." *Brinkley*, 66 Wn. App. at 848.

Here, Booth essentially asked the court to reconsider its ruling in light of newly proffered evidence, namely a jail handbook which indicated that the jail would not record calls by inmates to their attorneys. The court denied the motion, finding the evidence cumulative. Numerous witnesses testified at trial that once the jail registered an attorney's number in their phone-system database, all calls to that number would not be recorded. Thus, the purpose for which Booth offered the jail handbook was merely cumulative to testimony already in the record. Therefore, we conclude that the trial court did not abuse its discretion in refusing to reopen the case.

V.     INEFFECTIVE ASSISTANCE OF COUNSEL

Booth argues that he received ineffective assistance of counsel when his counsel failed to obtain a GTL records custodian to authenticate phone records. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011).

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on a claim of ineffective assistance of counsel, the defendant must show both (1) that defense counsel's representation was deficient and (2) that the deficient representation prejudiced the defendant. *Grier*, 171 Wn.2d at 32-33. If either prong is not satisfied, the defendant's claim fails. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004).

There is a strong presumption that counsel's representation was effective. *State v. Brett*, 126 Wn.2d 136, 198, 892 P.2d 29 (1995). Representation is deficient if, after considering all the circumstances, the performance falls "'below an objective standard of reasonableness.'" *Grier*,

171 Wn.2d at 33 (quoting *Strickland*, 466 U.S. at 688). "The burden is on a defendant alleging ineffective assistance of counsel to show deficient representation based on the record established in the proceedings below." *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). We do not consider matters outside the trial record. *State v. Linville*, 191 Wn.2d 513, 525, 423 P.3d 842 (2018). Legitimate trial strategy or tactics cannot serve as the basis for a claim of ineffective assistance of counsel. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

To show prejudice, a defendant must establish that "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Booth has not shown how he was prejudiced. Booth's proffered evidence appeared to indicate which conversations of his were recorded and monitored. However, besides Haskins, who overheard a portion of Booth's phone call, every witness who was asked whether they were aware that someone had overheard a phone call between Booth and his attorney answered no. Thus, whether Booth's calls were recorded, which the State agreed they were, was of minimal importance. Instead, the critical inquiry at Booth's hearing was whether jail staff shared the content of the overheard attorney-client conversation. *See Peña Fuentes*, 179 Wn.2d at 819-20. They testified that they did not. It appears Booth's proffered evidence would not have rebutted this testimony. Therefore, we conclude that Booth's ineffective assistance of counsel claim fails.

VI.      LFOs

Booth argues that the LFOs imposed on him violate RCW 10.01.160, the Eighth Amendment to the United States Constitution, and article I, § 14 of the Washington Constitution. We reject Booth's argument.

16

A.      Legal Principles

We generally review a decision imposing LFOs for abuse of discretion. *State v. Clark*, 191 Wn. App. 369, 372, 362 P.3d 309 (2015).  A trial court abuses its discretion when it exercises discretion in a manifestly unreasonable manner or bases its decision on untenable grounds or reasons.  *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001).  "We review constitutional challenges de novo."  *State v. Beaver*, 184 Wn.2d 321, 331, 358 P.3d 385 (2015).

B.      The Court Did Not Abuse Its Discretion

Because Booth's case was final prior to 2018, when the legislature made changes to the LFO statutes, those changes do not affect him.  *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

Here, the court vacated all discretionary LFOs from Booth's 2003, 2004, and 2010 cases. However, it did not vacate the crime victim penalty assessments, criminal filing fees, DNA database fees, and restitution because it did not have the discretion to do so, as they were mandatory.  Former RCW 7.68.035(1)(a) (2003, 2004, 2010); former RCW 9.94A.753(5) (2003, 2004, 2010); former RCW 36.18.020 (2003, 2004, 2010); former RCW 43.43.7541 (2003, 2004, 2010); *see also State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013).  Therefore, we conclude that the trial court did not abuse its discretion by continuing to impose mandatory LFOs on Booth.[7]

ATTORNEY FEES

Booth requests that this court not award the State appellate costs under RAP 14.

---

[7] Booth makes other challenges to his LFOs; however, because they were final in 2018, this appeal is not the proper forum to raise them.

The State does not request costs or otherwise respond. It is premature for us to address this issue at this time.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Maxa, C.J.

_____
Glasgow, J.