IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39501-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| AKEEM ALI MOORE, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Akeem Moore challenges two convictions for rape of a child, one of which allegedly occurred in an old house and a second which allegedly occurred in a Motel 6. He argues insufficient evidence sustains the crimes' element that the rapes occurred in Washington State. After reviewing the entire trial record, we conclude that sufficient evidence supports a jury finding beyond a reasonable doubt that a rape at Motel 6 occurred within the state of Washington, but insufficient evidence supports a verdict that a rape occurred in an old house in Washington. We affirm one conviction and reverse one conviction.

FACTS

This prosecution arises out of the alleged rape of a child, Jane, by her father, Akeem Moore. Because Moore challenges the sufficiency of the State's evidence to

demonstrate that one or both of the rapes occurred within Washington State, we present

the facts in the light most favorable to the State.  Because of the importance of the words

used by those testifying, we quote at length trial testimony.

Jane is a pseudonym.  We employ pseudonyms for all children.  The facts are

difficult to follow without a glossary of Akeem Moore's and Jane's family members.

| | |
|---|---|
| Akeem Moore | Father of Jane.  Accused. |
| Brandon Corsair | Uncle of Jane.  Son of Sandra Camden.  Lives in Arkansas.  Adopted Richard, Jane's younger brother. |
| Candice Ferguson | Mother of Jane.  Wife of accused. |
| Jane | Child victim. |
| John | Older brother of Jane.  Son of Akeem Moore and Candice Ferguson. |
| Michael Camden | Brother of Sandra Camden.  Granduncle of Jane.  Resides most of the relevant time in Arkansas. |
| Neomyah Haskins | Boyfriend of Tabitha Camden, aunt of Jane. |
| Richard | Younger half-brother of Jane.  Fathered by one other than Akeem Moore. |
| Sandra Camden | Grandmother of Jane.  Mother of Candice Ferguson.  Mother-in-law of the accused. |
| Tabitha Camden | Aunt of Jane.  Sister of Candice Ferguson.  Daughter of Sandra Camden |
| Tawnya | Older cousin of Jane.  Tabitha Camden's daughter. |

Appellant Akeem Moore and Candice Ferguson parented two children: Jane and

John.  Jane was born in June 2014.  John is one year older.  Father Akeem Moore had no

contact with Jane between December 1, 2016 and January 1, 2019.  The State alleged the

rapes occurred between January 2019 and October 2019.

Candice Ferguson frequently moved because of poverty, and she and her children

often stayed in cars and motels, including Motel 6s.  Ferguson struggles with addictions.

According to grandmother Sandra Camden, Ferguson and her two children likely stayed in more than one Motel 6.  The children also lived in numerous foster care homes both before and after the incidents giving rise to the criminal charges.

We lay the backdrop for the contact between Akeem Moore and Jane beginning in January 2019, by outlining where Jane lived.  In January 2019, Jane lived in the home of her maternal grandmother, Sandra Camden, at Springbrook Lane Apartments in Lakewood, Pierce County.  Also living in the Springbrook Lane apartment were Jane's mother, Candice Ferguson; Jane's elder brother, John; Jane's younger half-brother, Richard; Jane's aunt Tabitha Camden; the aunt's boyfriend Neomyah Haskins; and Jane's cousin, Tawnya.  No one testified that Akeem Moore stayed at the Springbrook Lane Apartments, let alone that he entered the grandmother's apartment.

In April 2019, the landlord evicted Jane's extended family from Springbrook Lane Apartments.  Mother Candice Ferguson, Jane, and John departed to an apartment in Sunrise, Oregon, to live with Akeem Moore.  Grandmother Sandra Camden does not know if the couple and the two children stayed in any Motel 6 on the way to Oregon or at any time in Oregon.  The remaining family members from the Springbrook Lane Apartments moved to Arkansas because of the lower cost of living.  Sandra Camden grew up in Arkansas, and some of her family continued to live in that state.  Those moving to Arkansas stopped in Oregon in route to Arkansas.  Sandra Camden, concerned

3

about John and Jane's wellbeing, unsuccessfully tried to convince Candice Ferguson to let the children come to Arkansas.

One month later, in May 2019, Candice Ferguson, Jane, and John, moved to Arkansas to join the rest of the family. A child protection services agency assisted the trio with the relocation. We do not know the reason for the intervention of the child protection agency. Father Akeem Moore remained in Oregon. Neomyah Haskins and Tabitha Camden broke up, and Haskins left Arkansas before the rest of the family departed the state.

In September 2019, the extended family departed from Arkansas to return to Pierce County. Grandmother Sandra Camden could not procure in Arkansas the care she needed for her multiple sclerosis. Candice Ferguson was pregnant and wanted to return to Akeem Moore. Jane's younger half-brother Richard remained in Arkansas, where Uncle Brandon Corsair adopted him. Sandra Camden's brother, Michael Camden, who had resided in Arkansas before the appearance of the clan, returned with his sister's family to Washington. We do not know where family members slept at night on their arrival in Pierce County in September.

The extended Camden family separated, in October 2019, after returning to Washington. Sandra Camden drove back to Arkansas to ferry her brother and check the mail. Michael Camden needed to return to Arkansas because he had attempted to steal a van.

4

While Sandra Camden drove to and from Arkansas, Tabitha Camden, Candice Ferguson, and the two sisters' children, Tawnya, John, and Jane, stayed for awhile in a Motel 6. During trial, Tabitha Camden first testified that the two sisters and their children stayed in Motel 6 a couple times. She later testified that she and her daughter stayed in the motel only one night and then moved to an Econo Lodge. Tabitha testified that Akeem Moore joined them at the Motel 6. Ferguson, Moore, and the couple's children stayed longer in the Motel 6 than Tabitha Camden. Moore told a law enforcement officer that he once visited with his family in a motel. Eventually, in October 2019, Candice Ferguson, John, and Jane left with Moore to return to Oregon.

In the meantime, Sandra Camden attempted to leave her brother in Arkansas, but he refused to exit the car. Sandra Camden returned to Washington State, through Colorado, and placed her brother behind a Walmart store with his three children and a dog. In October 2019, grandmother Sandra returned to Pierce County. She was homeless and lived in a van at first, but then a friend, Robin, opened her home to Sandra Camden and presumably others.

Eventually, Sandra Camden procured an apartment in Tacoma. Later in October 2019, Jane and John returned to the residence of maternal grandmother Sandra Camden in Tacoma. Candice Ferguson abandoned the children at the Tacoma apartment.

Candice Ferguson sometimes took John and Jane to Akeem Moore's mother's house in the Tacoma area. We do not know the name of Moore's mother. We do not

5

know what dates or even months, between January and October 2019, that the children stayed at the paternal grandmother's home. Candice Ferguson and Akeem Moore also spent some nights at the Tacoma home of Moore's mother. The paternal grandmother lived in a house, rather than an apartment. Moore told the police officer that, during one night when his children stayed at his mother's residence, the children slept in his bedroom, while he slept in a car.

We now outline trial testimony about the alleged rape and then Jane's reporting of the molestation. After the allegations arose, Keri Arnold, a forensic interviewer, interviewed Jane. The jury saw and heard the videotape of the interview. In the video, Jane discussed rapes occurring in an "old house" and "hotel."

> KERI ARNOLD: Where did daddy put his pee-pee in your pee-pee?
> [JANE]: At the hotel and the old house.
> KERI ARNOLD: Where is the old house?
> [JANE]: Um, it's far away.

Exhibit 1-A at 02:04:10 PM (citation to time of day depicted in video exhibit).

> KERI ARNOLD: When daddy stuck his pee-pee in where were you at?
> [JANE]: I was at the old house.
> KERI ARNOLD: Where in the old house were you?
> [JANE]: Just take a left and a right and go . . . it's a number one, so you have to [inaudible] and get a phone at the office.
> KERI ARNOLD: Okay. So how about . . . when daddy stuck his pee-pee in, where were you at the house?
> [JANE]: Um, because, because, my nana dropped me off, and my mom dropped me off with him.

Exhibit 1-A at 02:07:40 PM

6

KERI ARNOLD: Did daddy stick his pee-pee in your pee-pee at just one old house, or was it more than one old house?
[JANE]: One old house and one hotel.

Exhibit 1-A at 02:26:16 PM

KERI ARNOLD: Tell me about the old house. What did the old house look like?
[JANE]: The old house is with brown stuff in there and there's a kitchen we got all the stuff out of the car.

Exhibit 1-A at 02:26:44 PM

KERI ARNOLD: Who lived at the old house?
[JANE]: My dad and my mom and [John] and me.

Exhibit 1-A at 02:27:33 PM

KERI ARNOLD: When daddy stuck his pee-pee in your pee-pee, where did [half-brother] [Richard] live?
[JANE]: With Brandon.
KERI ARNOLD: With Brandon?
[JANE]: Mm-hm.

Exhibit 1-A at 02:37:42 PM

Jane testified at trial. Jane responded during direct examination:

Q.    Can you tell me what happened?
A.    We went in this little Motel 6, and we—I slept on one bed, and my dad slept on the other bed.
Q.    Then what happened?
A.    And then my privates got touched.
Q.    By who?
A.    By my dad.
. . . .
Q.    Nope. Okay. Is that the only place that happened?
A.    No.

Q. Where else did it happen?
A. We had a little house.
Q. Yeah? What happened at the little house?
A. It happened the same thing.
Q. Was anyone else there, or was it just you and your dad?
A. It was me and my dad and my mom and my brother, [John].
Q. Was there anyone else—anywhere else where it happened or was it just at the Motel 6 and the little house?
A. Just the little house.
Q. Where was the Motel 6?
A. It was in, I think, Oregon.
Q. Oregon? What about the little house, where was the little house?
A. It was like Motel 6, but we hurried up and went over there.

Report of Proceedings (RP) at 478-79.

During cross-examination, Jane testified:

Q. And the Motel 6 you say was down when you were in Oregon; is that right?
A. Yep.
Q. Okay. And I wasn't quite sure I heard you. You said when the other guy, Mr. Hashimoto [the State's attorney]—he was the guy that was just asking you questions. Okay? He had asked you about where the little house was. Okay? Did you say that was also in the same place where—in the same area where the Motel 6 was?
A. Yep.
Q. When you came back to Washington, did you have—when you first got back here after coming back from where you were living with Uncle—or staying there where Uncle Mike was—
A. Uncle Mike?
Q. Where you were staying with Uncle Mike in Arkansas, right?
A. Yep.
Q. When you came back here to—did you come right back to Tacoma, you know, or somewhere else on the way?
A. Somewhere else on the way.
Q. You eventually got back here, right?
A. Yep.

8

Q.     And at first did you have a place to stay, a house?
A.     Yep.
Q.     Or were you staying in an apartment?
A.     A house.
Q.     It was a house at first?
A.     Yep, and then an apartment.
Q.     Then didn't you also for a while you had to stay in a car?
A.     Yeah.
Q.     Because you didn't have a house?
A.     No.
Q.     No, you didn't have a house or, no, I'm wrong?
A.     We was in the car first, and then we found a house.  It was cheap, and then we went to Motel 6 after when the house got a little bit more.
Q.     So I had the wrong order?
A.     Yep.
Q.     Then when you didn't stay in the house, then you then stayed in another Motel 6?
A.     Yep.
Q.     Is that Motel 6 you stayed at at that point different than the Motel 6 you stayed at in Oregon?
A.     Yep.
Q.     Is what happened with your dad, was that at the one in—the first one in Oregon or the one back here in Washington?
A.     In Oregon.

RP at 490-92.

During redirect examination, Jane avowed:

Q.     Do you remember when—I think his name is Travis—when Travis, the defense attorney, was asking you questions, and he asked you when this happened whether you were in Washington?  Do you remember that?
A.     Yep.
Q.     Do you remember your answer being we weren't in Washington, we were in Tacoma?
A.     Yep.
Q.     Was that true?

   A. Yep.
   Q. So did this happen in Tacoma?
   A. Yep.

RP at 501.

 Finally, on recross-examination, Jane testified:

   Q. When you said before that this happened in Oregon, and it was asked whether it happened in Tacoma.  Are you sure whether it happened in Tacoma or Oregon?
   A. Yep.
   Q. You sure?
   A. Yep.
   Q. Did you tell me before it happened Oregon [sic]?
   A. It happened in Oregon.
   Q. And okay.  Well, he just asked you if it happened in Tacoma.
   MR. HASHIMOTO: Objection, asked and answered.
   THE COURT: Overruled.  Re-ask your question.
   Q. (By Mr. Currie) Do you know for sure?
   A. No.

RP at 502-03.

 Jane's brother John testified at trial during direct examination:

   Q. Okay.  So the last time you and me talked, you told me about something that you said happened in an apartment.  Do you remember that?
   A. A part?
   Q. Apartment.
   A. Yeah.
   Q. In a room in an apartment, right?
   A. Yeah.
   Q. Okay.  So tell me what happened between your dad and [Jane] in the room in the apartment.
   A. He just put his pee-pee in [Jane's] pee-pee.
   Q. How do you know that?
   A. It's because I saw it.
   Q. Okay.

    A.    And [Jane] told me too.  I was asleep.
    . . . .
    Q.    Do you remember who all was in the apartment the day that you saw what you saw?
    A.    Mommy, dad, and me, and [Jane].  That's all.

RP at 569-70.

    Q.    Okay.  Now, I'm going to ask you a little bit about the apartment.  Okay?
    A.    Okay.
    Q.    Did you stay in the apartment for a long time or short time?
    A.    For a long time because they kept going into apartments, in, like, twenty apartments, I think.  It was too much.  I can't explain it.

RP at 572-73.

During cross-examination, John averred:

    Q.    So when you're talking about somebody sticking their privates between [Jane] and your dad, is this something you saw or—
    A.    Nothing that I saw.  I was— how should I see—
    Q.    You heard something?
    A.    Yeah, I just kept hearing something.  I kept hearing something.  I kept hearing something, and I was awake.

RP at 578-79.

    Q.    How about the apartment where we're talking about that this thing that happened that you saw or that you heard with [Jane] and your dad, do you remember where that was?
    A.    Yeah.  Actually, no, I didn't.  It was not an apartment.  I think it was 6—616, I think.  I think it was 616.
    Q.    Do you know—do you remember how long ago it was?
    A.    I think it was, like, seven years old, seven years ago, like one year.  Seven years old, a year, I think.

RP at 581-82.

At some unidentified time, Jane told cousin Tawnya that Jane's father hurt her. Jane used the word "vagina" and added that her father touched her also in other forbidden places. Tawnya first testified at trial that Jane whispered in her ear at Candice Ferguson's house when Tawnya's mother, grandmother, and Aunt Candice were present. Tawnya did not identify the location of Candice Ferguson's residence at the time of the whisper. Later Tawnya testified that the whisper occurred adjacent to her grandmother's jeep. Jane never disclosed to Tawnya the location where Jane's father molested her.

According to cousin Tawnya, as the family departed for Arkansas, presumably in April 2019, Tawnya told her mother Tabitha Camden that Akeem Moore had touched Jane inappropriately. Tawnya also testified that she told her grandmother of the touching, although the grandmother did not confirm this disclosure from Tawnya. Tawnya was twelve years old at the time of her trial testimony in October 2021. Tawnya testified that she was between 4 and 8 years of age, inclusive, when Jane whispered the comment of her father molesting her. Jane denied telling Tawnya about the abuse.

While in Arkansas, grandmother Sandra Camden witnessed Jane randomly approach a police officer. Camden overheard Jane claim to the officer: "'My daddy put his pee-pee in my pee-pee.'" RP at 523. Neither police nor a family member took action after the disclosure.

On an unidentified day, presumably in October 2019 after the family's return from Arkansas, grandmother Sandra Camden drove Jane and John in the Tacoma area, when

Jane declared "'That's where it happened, nana.'" RP at 529. Grandmother Camden asked, "'What happened?'" Jane replied, "'My daddy put his pee-pee in my pee-pee again.'" RP at 529. The grandmother and grandchildren were then passing a Motel 6. During trial Sandra Camden did not specify the location of this Motel 6.

Later in testimony, Sandra Camden averred that Jane twice, while driving by a Motel 6, disclosed inappropriate touching by her father. One incident occurred in Fife, a community in Pierce County. The second occurred while driving on Hosmer Street in Tacoma. When passing the motel in Fife, Jane cried when declaring: "'That's where it happened, nana.'" RP at 559. Grandmother Camden assumed that Jane reacted to the Motel 6 sign on the hotel building.

Grandmother Sandra Camden took Jane to Mary Bridge Children's Hospital. Blair Minson, a sexual assault nurse, examined Jane, and child forensic interviewer Keri Arnold interviewed Jane. The physical exam revealed no injuries.

PROCEDURE

The State of Washington charged Akeem Moore with two counts of rape of a child in the first degree. The charges went to trial. Moore and Jane's mother, Sandra Camden, did not testify at the trial.

At the conclusion of trial, Akeem Moore sought dismissal of the charges on the ground that no rational jury could find beyond a reasonable doubt that any alleged rape occurred within the state of Washington. The superior court denied the motion.

13

During closing, the State's attorney intoned:

> So let's talk about separate and distinct acts. . . . And you have to find if you find the defendant guilty of two counts. Okay? You have to find that those two counts are separate and distinct. Okay? That means that there's two instances. . . . That's also been folded into by what's Jury Instruction No. 12, which has two paragraphs. And essentially what that says is that to find the defendant guilty, you have to be unanimous as to which act has been proved.
>
> If you want to find—if you think that the evidence is proved beyond a reasonable doubt two crimes, you would need to find—unanimously agree that this happened on at least twice on two separate occasions.

RP at 789. The prosecuting attorney later added:

> *Not only that, but she described two places at least where this happened, the old house and a hotel.*
> We talked earlier about the [Tawnya] whisper and how it happened earlier on in 2019. Where were they living then? They weren't living at hotels. They were living at Springbrook Lane, a townhome. Or, I submit to you, as a five-year-old girl might describe it after about half the year goes on, the old house. And then, well, what a coincidence. She discloses in a car in Fife after they had been living in hotels. Well, now it's the old house and hotel. It's happened on two distinct occasions. Not only that, but she's driving around with [grandmother] Sandra and points out two separate Motel 6s in Fife and on Hosmer. "That's where it happened, nana." That happened on more than one occasion.

RP at 790-91 (emphasis added).

The prosecuting attorney continued later:

> So now we have to prove that it happened in Washington. I will note that during your deliberation one of you might say, "Well, they were down in Oregon for a little bit. How do we know it didn't happen in Oregon?" *It might have happened in Oregon.* He was living with her. The State is not debating that, but the State has evidence that it had occurred in Washington. We have a disclosure that was made on the 4th of April 2019 when [Jane] was living in Washington and never left the state, except for a

14

one-day trip, and they didn't stay anywhere except to go to an outlet mall or something like that, and they came right back to their same living situation. Then we have them coming back.

Pointing to Hosmer, pointing to Fife, that's where it happened in Motel 6 right there. We have evidence that shows that they were living in an apartment, and they're down in Oregon. Sandra visited them there. State's proved Element 4 beyond a reasonable doubt that these events happened in Washington, and we have the timeline here again.

RP at 792 (emphasis added).

During closing, Akeem Moore's trial counsel emphasized that grandmother Sandra Camden concluded that, when Jane identified the Motel 6 in Fife and the Motel 6 on Hosmer Street in Tacoma, Jane was not specifying that each discrete Motel 6 was the location for a rape, but rather referencing Motel 6 generically as the location. Counsel highlighted that Jane also mentioned a Motel 26 and that the family could have stayed in Motel 6 in Oregon.

In rebuttal, the State's attorney argued:

So those two jury instructions are the things I want to talk about. First, I will deal with the jurisdictional element. So what inference can you draw from [Aunt] Tabitha's statement that [Tawnya] told me before they left Washington that something had happened. . . . There are two possible inferences, the State suggests.

One of them is, okay, that the Oregon thing is off the table. Okay? Because at least the first incident, what I call the old house incident, that would be Count I had to occur before they got to Oregon. It had to occur in Washington. They never left the state, other than that.

RP at 824.

The jury convicted Moore of both charges of rape.

15

LAW AND ANALYSIS

On appeal, Akeem Moore repeats the theme of his trial motion to dismiss. Moore challenges the sufficiency of the evidence presented at trial to sustain the jury's findings on both counts that the criminal acts occurred in Washington. He does not argue against a finding of rape.

A person who commits any crime in the state of Washington, in whole or in part, is liable to punishment here. RCW 9A.04.030(1). Thus, a court may exercise criminal jurisdiction if an essential element of an offense was committed within the state. *State v. Lane*, 112 Wn.2d 464, 471, 771 P.2d 1150 (1989). Proof of jurisdiction beyond a reasonable doubt is an integral component of the State's burden in every criminal prosecution. *State v. Squally*, 132 Wn.2d 333, 340, 937 P.2d 1069 (1997). We treat the location of any rape the same as any fact needed to be demonstrated beyond a reasonable doubt.

Washington courts repeatedly pronounce the standard of review for challenges to sufficiency of evidence. On sufficiency of the evidence review, this court asks whether "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We draw all reasonable inferences in favor of the State. *State v. Salinas*, 119 Wn.2d 192, 201 (1992). This court defers to the factfinder on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.

*State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). Sufficiency of the evidence is a question of constitutional magnitude because due process requires the State to prove its case beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Anderson*, 198 Wn.2d 672, 685-86, 498 P.3d 903 (2021).

No witness testified directly as to the precise location of any rape. Therefore, the jury needed to rely on circumstantial evidence. In analyzing the sufficiency of evidence, this court does not treat circumstantial evidence as less reliable than direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). Still, when an inference supports an element of the crime, due process requires the presumed fact to flow more likely than not from proof of the basic fact. *State v. Hanna*, 123 Wn.2d 704, 710, 871 P.2d 135 (1994); *State v. Jameison*, 4 Wn. App. 2d 184, 200, 421 P.3d 463 (2018). Whether an inference meets the appropriate standard must be determined on a case-by-case basis in light of the particular evidence presented to the jury in each case. *State v. Jameison*, 4 Wn. App. 2d 184, 200 (2018).

When considering a motion to dismiss for insufficiency of evidence, the court only reviews the legal sufficiency of the evidence to support a verdict, not its weight, which is a matter for the jury. *State v. Barnett*, 368 N.C. 710, 782 S.E.2d 885, 888 (2016). Contradictions and discrepancies in the evidence in a criminal prosecution do not warrant

dismissal of the case. *State v. Whitman*, 179 N.C. App. 657, 635 S.E.2d 906, 914 (2006).

Substantial evidence is evidence that is of sufficient force and character that it will, with

reasonable certainty, compel a conclusion one way or the other without resorting to

speculation or conjecture. *Booth v. State*, 26 Ark. App. 115, 761 S.W.2d 607, 608

(1989). Conversely, when assessing sufficiency of evidence, we may not rest on guess,

speculation, or conjecture. *State v. Colquitt*, 133 Wn. App. 789, 796, 137 P.3d 892

(2006). We are not justified in inferring, from mere possibilities, the existence of facts.

*Gardner v. Seymour*, 27 Wn.2d 802, 810-11, 180 P.2d 564 (1947).

In a civil suit, an opposing party may obtain a directed verdict or judgment

notwithstanding the verdict when no competent evidence or reasonable inference from

the evidence would sustain a jury verdict in favor of the nonmoving party. *Levy v. North

American Co. for Life & and Health Insurance*, 90 Wn.2d 846, 586 P.2d 845 (1978).

But, in determining whether to grant such a motion, the opposing party must have

presented "substantial evidence," as distinguished from a "mere scintilla" of evidence, to

support the verdict. *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980).

We find no case to distinguish between the quantum of evidence needed to prove a

fact beyond a reasonable doubt as opposed to by a preponderance of evidence. Legal

logic demands, however, more convincing evidence in a criminal trial than in a civil suit.

Thus, the State should present more than substantial evidence supporting all elements of

the crime in order to sustain a guilty verdict.

18

The State did not identify in its information the locations of the two respective counts. In closing argument, a prosecutor may specify on which acts the State relies to prove each separate count. *State v. Pena Fuentes*, 179 Wn.2d 808, 824-26, 318 P.3d 257 (2014). We read the State's closing argument to have specified that count one occurred while Jane lived in an old house and count two occurred in a Motel 6.

We review the locations where Jane resided from January to October 2019. Beginning in January, Jane resided at Springbrook Lane Apartments in Lakewood with her grandmother, mother, and extended family. In April she moved to Oregon with her mother, father, and brother John. We do not know the nature of the housing in Oregon. Although the grandmother and extended family stopped at one of the Oregon residences, no witness described the nature of the residence. Jane lived in Arkansas for one month, but no witness described the housing in Arkansas.

In September 2019, Jane returned to Pierce County. We do not know where family members slept at night on their arrival in Pierce County in September. For a while in October, Jane stayed with her mother, Aunt Tabitha, brother, and cousin in a Motel 6 in the Tacoma area. Akeem Moore joined the group at the Motel 6, and Aunt Tabitha and her daughter vacated the motel before Jane's immediate family. Akeem Moore, Candice Ferguson, John, and Jane then left again to return Oregon. We do not know the nature of the housing during the second time that Jane lived with her father in Oregon. Within a month, Jane returned to her grandmother's recently rented apartment in Tacoma.

19

Candice Ferguson and Akeem Moore, with the children, also spent some nights at the Tacoma home of Akeem Moore's mother. We do not know the dates of the stays. We assume the residence was a single-family residence that included at least two bedrooms, one of which Moore's mother assigned to Moore.

We conclude that the State did not prove beyond a reasonable doubt that count 1, which nominated an old house as the situs of the rape, occurred in Washington State. The State contends that, when Jane mentioned the old house, she referenced the Springbrook Apartments. We recognize that a small child may not distinguish between an apartment and a single-family residence. Nevertheless, we consider this possibility to be speculation. No other witness ever equated the apartment to an old house. The State never asked Jane if she understood the difference between a house and an apartment, and, if so, what constituted the difference. Akeem Moore and Jane may have interacted in a house in Oregon. Most importantly, no testimony suggested that Akeem Moore had contact with Jane at Springbrook Apartments. This court should not rely on its own inferences from the evidence, but we observe that the grandmother disliked Moore and may not have permitted Moore inside her residences.

Jane's testimony did not help to locate the old house. More often than not, she testified that all rapes occurred in Oregon. Jane told a law enforcement officer in Arkansas that her father put his pee-pee in her pee-pee. By this time, Jane had already resided with her father in Oregon. Jane testified that the house was located in the same

20

area as the Motel 6. Nevertheless, she provided this testimony at the same time she said that the Motel 6, where the rape occurred, was in Oregon.

We recognize the difficulty of procuring reliable testimony from a child, which often frustrates prosecution of child sex abuse cases. *State v. Jones*, 112 Wn.2d 488, 493-94, 772 P.2d 496 (1989); *State v. Dunn*, 125 Wn. App. 582, 588, 105 P.3d 1022 (2005). A child hearsay statute functions to alleviate these difficulties. RCW 9A.44.120. Nevertheless, not even the hearsay testimony offered by the State demonstrated beyond a reasonable doubt that any rape occurred in an old house in Washington State.

A finder of fact could conclude that Akeem Moore gained access to Jane at his mother's residence in Tacoma and that the residence was an "old house." The State never argued during trial that one of the rapes occurred at the mother's residence. Also, we do not know if Jane was taken to the paternal grandmother's house before she disclosed rape to Tawnya.

John's testimony fails to supply a foundation on which to conclude beyond a reasonable doubt that a rape occurred at Springbrook Apartments. Although he initially stated he saw his father stick his "pee-pee" in his sister's "pee-pee" in an apartment, he also testified he did not see such conduct. He never identified the location of the apartment. He stated he lived in twenty apartments. He also testified inconsistently that whatever he saw or heard did not happen in an apartment. He may have suggested the incident happened at a place with the number 6.

21

The State emphasizes that some evidence showed that Jane disclosed at least one rape to her cousin Tawnya before Jane left for Oregon in April 2019. Based on this testimony, the State argues one of the rapes must have occurred in Springbrook Apartments. Still, the State presented no testimony of access by Akeem Moore to Jane at this Lakewood apartment. Any contact remains speculation. Also, Tawnya also testified that the disclosure occurred years before Jane and she resided at the apartment.

We conclude that a jury could have reasonably concluded that a rape occurred at a Motel 6 in Washington State. The undisputed evidence placed Jane and Akeem Moore together at a Motel 6 in the Tacoma area at a time when only Jane's immediate family was present. Although Akeem Moore, through argument, implied that he may have stayed with Jane in an Oregon hotel, he presented no testimony supporting such an alleged fact. Valuable circumstantial evidence supports a finding of a rape in a Washington Motel 6.

## CONCLUSION

We remand to the superior court with directions to reverse the conviction for count 1 of child rape and dismiss the charge with prejudice. We affirm the conviction on charge 2. During remand, the superior court should resentence Akeem Moore.

22

No. 39501-4-III
*State v. Moore*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Siddoway, J.

_____
Pennell, J.