# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE FEB 0 6 2014

CHIEF JUSTICE



This opinion was filed for record
at 8:00 a.m. on February
6, 2014

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| Respondent, | ) | No. 88422-6 |
| v. | ) | En Banc |
| JORGE NAHUN PEÑA FUENTES, | ) | |
| Petitioner. | ) | Filed FEB 0 6 2014 |

OWENS, J. -- The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel, which includes the right to confer privately with that counsel. State intrusion into those private conversations is a blatant violation of a foundational right. We strongly condemn "the odious practice of eavesdropping on privileged communication between attorney and client." *State v. Cory*, 62 Wn.2d 371, 378, 382 P.2d 1019 (1963). We presume that such eavesdropping results in prejudice to the defendant and have vacated criminal convictions when there was no way to isolate the prejudice to the defendant from such "shocking and unpardonable conduct." *Id.*

In this case, we are asked whether a conviction must be vacated even if it were shown that the eavesdropping did not result in any prejudice to the defendant—in other words, whether the presumption of prejudice from such eavesdropping is rebuttable. That question is crucial in this case because here, the police detective eavesdropped on attorney-client conversations *after* the trial was complete and the jury had found the defendant guilty. Thus, while the conduct was unconscionable, there was no way for the eavesdropping to have any effect on the trial itself. Further, the prosecutor submitted a declaration stating that the detective on the case never communicated any information about the attorney-client conversations to the prosecution.

In light of these circumstances, we hold that eavesdropping is presumed to cause prejudice to the defendant unless the State can prove *beyond a reasonable doubt* that the eavesdropping did not result in any such prejudice. In this case, the record does not provide enough information to make this determination, and we remand for additional discovery.

## FACTS

While the most significant issue in this case involves the detective eavesdropping on conversations between Jorge Nahun Peña Fuentes and his attorney, there are also legal challenges to four other rulings: (1) the trial judge's decision regarding discovery related to the eavesdropping, (2) the trial judge's evidentiary

ruling related to a letter by Peña Fuentes's daughter (who is also the victim's half sister), (3) the trial judge's ruling that Peña Fuentes's convictions for both rape of a child and child molestation violated his double jeopardy rights, and (4) the Court of Appeals' denial of Peña Fuentes's motion to supplement the record. Below is a summary of the basic facts in this case, as well as the facts related to each of the various legal issues.

*J.B. Reports Abuse*

In November 2008, ninth grader J.B. told her school counselor that her stepfather, Peña Fuentes, had touched her inappropriately when she was younger. The counselor immediately contacted Child Protective Services and J.B.'s parents. The police investigated, and Peña Fuentes was eventually charged with first degree rape of a child, three counts of first degree child molestation, and three counts of second degree child molestation.

*Overview of the Trial*

Peña Fuentes was put on trial in October 2010. Because of the ongoing nature of the abuse and the limitations of J.B.'s memories from childhood, the prosecution did not know the specific dates of particular incidents of abuse. However, J.B. could recall the location of abuse, and because the family had moved somewhat frequently, the different incidents of abuse could be connected with specific time periods based on where the family was living when the abuse occurred. Therefore, the prosecution

based its charges on conduct occurring during a certain time period, which it

determined based on where the family was living at the time:

- Count II was based on abuse alleged to have occurred while the family was living at an apartment in Bellevue, between November 26, 2000 and June 1, 2003.

- Counts I, III, and IV were based on abuse alleged to have occurred while the family was living at a condo between January 1, 2003 and November 25, 2005.

- Counts V, VI, and VII were based on abuse alleged to have occurred after Peña Fuentes and J.B.'s mother had divorced, while J.B. was living with her mother in Sammamish and Peña Fuentes was living in Redmond between November 26, 2005 and November 25, 2007.

At trial, J.B. testified about many incidents of inappropriate touching,

beginning when she was in first grade. Her memories of the early abuse at the

Bellevue apartment (related to count II) were "[n]ot very good," 2 Verbatim Report of

Proceedings (VRP) at 322, and the jury ultimately found Peña Fuentes not guilty on

count II.

J.B.'s memories of later abuse at the condo (related to counts I, III, and IV)

were much clearer. She testified in detail about repeated incidents of Peña Fuentes

abusing her at the condo. *Id.* at 329-30. J.B. also testified about two specific and

particularly severe incidents involving penetration that occurred while they were

living at the condo. The jury ultimately found Peña Fuentes guilty on counts I, III,

and IV.

J.B. indicated that the abuse was less frequent after Peña Fuentes and her mother divorced. During this time, J.B. testified that the abuse occurred at Peña Fuentes's home in Redmond (related to counts V, VI, and VII). The jury was unable to reach unanimity on the remaining charges.

No witnesses directly corroborated or refuted J.B.'s testimony. Some of the State's witnesses, including J.B.'s grandmother, testified that J.B. sometimes expressed discomfort about having to go to Peña Fuentes's house, and two of J.B.'s friends testified that she had alluded to the abuse in previous years.

Peña Fuentes himself did not testify at trial, but the original police interview of Peña Fuentes was submitted as evidence. During that interview, he denied most of the abuse but acknowledged a few incidents that occurred while he was roughhousing with J.B.

*L.P.'s Testimony at Trial*

Most of the issues now in front of us arise out of a series of events that began with a letter written by J.B.'s half sister, L.P. L.P. is about four and a half years younger than J.B. and has the same mother, but is the biological daughter of Peña Fuentes. At trial, the defense introduced a letter to the prosecutor that L.P. had written when she was 11 years old. In the letter, L.P. indicated that she believed J.B. was lying at the behest of their mother based on a conversation she had overheard between them. In her deposition, L.P. indicated that she could not recall whose idea

the letter was, and that she could no longer remember what she had overheard her mother say to J.B.

The trial judge allowed the jury to consider the letter in order to assess L.P.'s credibility—i.e., for impeachment purposes only—but not for the truth of the matter asserted within the letter. At trial, L.P. again testified that she could not remember the conversation between her mother and J.B.

*Double Jeopardy Ruling*

After his conviction, Peña Fuentes filed a motion for a new trial, arguing that his convictions for first degree rape of a child (count I) and first degree child molestation (counts III and IV) violated his double jeopardy rights. Peña Fuentes argued that the jury could have found him guilty of rape of a child and child molestation for the same act because the court did not instruct the jury that those occasions had to be separate and distinct from the act alleged in count I. The trial judge agreed and granted a new trial on count I. He then ruled that count I could not proceed to trial because of the police misconduct discussed below, so he dismissed it with prejudice.

*New Video of L.P.*

After Peña Fuentes's conviction and while the motion for the new trial was pending, the defendant's current wife, Mihaela Peña,[1] and her brother, Corneliu

---

[1] To avoid confusion, we refer to Mihaela Peña by her first name in this opinion.

Hertog, decided to contact L.P. about her testimony. Hertog discovered through Facebook where L.P. had recently begun attending church and approached her there. Hertog and L.P. dispute the nature of the ensuing conversation. Hertog contends that they simply explained to L.P. that her trial testimony had been unclear and asked if she would be willing to clarify what she remembered. According to Hertog, L.P. agreed to clarify her testimony on camera "without any hesitation," and when Mihaela asked L.P. if she felt threatened or intimidated, L.P. answered no. Clerk's Papers (CP) at 71.

On the video, Mihaela asked, "And what is it that you can testify to? And what have you told me before?" and L.P. responded, "That all the accusations I made to my dad are not true and that I heard my mom and my sister plotting to accuse my dad of sexual assault." *Id.* at 146.

However, L.P.'s version of the events surrounding the videotaping differs significantly from Hertog's. L.P. indicates that she panicked when Mihaela and Hertog showed up at her church and that she "had never felt more scared in [her] life." *Id.* at 150. She states that once she saw they had a video camera, she knew Mihaela and Hertog would not leave unless she made a video saying what they wanted her to say. According to L.P., Mihaela told L.P. how to answer the questions on the video. On camera, L.P. answered accordingly, but later said, "I only did that because I was scared . . . I knew that all the things I had said in that video were lies." *Id.* at 151.

Peña Fuentes then filed a supplemental motion for a new trial based on (1) the judge's decision to disallow L.P.'s letter at trial and (2) the "newly discovered evidence" of the video of L.P. recanting her trial testimony. *Id.* at 58. The trial judge denied the motion. On the first issue, he ruled that the decision to exclude L.P.'s letter was within the court's discretion. On the second issue, the trial judge noted that it came down to credibility. He found that L.P. was already impeached at trial and that the video would not have changed the results.

*A Detective Listens to Private Attorney-Client Conversations*

After learning of Mihaela and Hertog's visit to L.P. at her church in mid-December 2010, the prosecutor and the police decided to investigate possible witness tampering. The prosecutor asked Detective Casey Johnson to listen to Peña Fuentes's phone calls from jail. On January 5, 2011, Detective Johnson informed the prosecutor that he had listened to all of Peña Fuentes's phone calls, including six conversations between Peña Fuentes and his attorney. The prosecutor immediately informed Detective Johnson that he should not listen to any more calls and that he should not disclose the content of the conversations between Peña Fuentes and his attorney to anyone. The prosecutor also requested that the detective be removed from the witness tampering investigation. The prosecutor then told defense counsel about the eavesdropping. The prosecutor later submitted a declaration stating that Detective

Johnson did not disclose the content of the phone calls between Peña Fuentes and his attorney to him.

Because of the eavesdropping, Peña Fuentes moved to dismiss all charges with prejudice. The trial judge agreed that the police misconduct was "egregious." 3 VRP at 593. However, he denied the motion to dismiss, concluding that the police misconduct did not affect either the trial—which had concluded prior to the eavesdropping—or the motion for a new trial. Peña Fuentes moved for discovery of all police reports and evidence gathered by Detective Johnson, arguing that he had previously requested such information but that the prosecutor had not provided it. He also moved to dismiss all charges because the State withheld such evidence. The judge denied the motion for discovery because he had already ruled on the underlying motion.

*Motion To Supplement the Record on Appeal*

Peña Fuentes appealed the trial court's ruling that the police misconduct did not affect the trial, as well as its rulings on discovery and excluded evidence. The State cross appealed the trial judge's ruling on the double jeopardy violation.

At the Court of Appeals, Peña Fuentes filed a supplemental designation of clerk's papers, which included a formal complaint filed with the King County Sheriff's Department regarding Detective Johnson's actions, as well as the sheriff's department's response. Upon a motion from the State, the Court of Appeals struck the

materials because (1) Peña Fuentes failed to address RAP 9.11, (2) the additional evidence he submitted did not appear likely to change the decision being reviewed, and (3) it would not be inequitable to decide the case on the existing record.

The Court of Appeals affirmed all of the trial court's rulings except the double jeopardy ruling and remanded for a longer sentence. *State v. Peña Fuentes*, No. 66708-4-I, slip op. (unpublished portion) at 18 (Wash. Ct. App. Jan. 14, 2013). Peña Fuentes petitioned for review and this court granted review. *State v. Peña Fuentes*, 177 Wn.2d 1008, 302 P.3d 180 (2013).

## ISSUES

1. Is the presumption of prejudice resulting from the State eavesdropping on attorney-client conversations rebuttable? If so, what standard of proof is required?

2. Did the trial judge err when he denied discovery of police reports related to the eavesdropping?

3. Did the trial judge err when he allowed admission of L.P.'s letter only for witness impeachment purposes?

4. Did Peña Fuentes's convictions for first degree rape of a child and first degree child molestation violate double jeopardy?

5. Did the Court of Appeals correctly strike Peña Fuentes's supplemental clerk's papers?

## ANALYSIS

*A. The Presumption of Prejudice Resulting from the State Eavesdropping on Attorney-Client Conversations Can Be Rebutted If the State Shows the Absence of Prejudice Beyond a Reasonable Doubt*

A defendant's constitutional right to the assistance of counsel unquestionably includes the right to confer privately with his or her attorney. *Cory*, 62 Wn.2d at 373-74. In *Cory*, the seminal Washington case on this issue, this court dismissed a defendant's charges with prejudice because of an appalling decision by the sheriff to install a microphone in the jail's conference room and eavesdrop on conversations between the defendant and his attorney during trial. *Id.* at 372, 378.

The *Cory* court presumed prejudice arising from the eavesdropping that occurred during trial. *Id.* at 377 & n.3 ("we must assume that information gained by the sheriff was transmitted to the prosecutor" and therefore "[t]here is no way to isolate the prejudice resulting from an eavesdropping activity, such as this"). However, the court did not directly address whether all eavesdropping is per se prejudicial or if the presumption of prejudice is rebuttable.

The United States Supreme Court has expressly rejected a per se prejudice rule for such eavesdropping, holding that when an eavesdropper did not communicate the topic of the overheard conversations and thereby create "at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation." *Weatherford v. Bursey*, 429 U.S. 545, 557-58, 97 S. Ct. 837, 51 L. Ed. 2d

11

30 (1977) (reviewing a case where an undercover agent sat in on a meeting between defendant and counsel but did not communicate anything about the meeting to anyone else). The United States Supreme Court's reasoning is sound, and we agree with it. While eavesdropping on attorney-client conversations is an egregious violation of a defendant's constitutional rights and cannot be permitted, there are rare circumstances where there is no possibility of prejudice to the defendant. We do not believe the extreme remedy of dismissing the charges is required when there is no possibility of prejudice. To account for those rare circumstances where there is no possibility of prejudice to the defendant, we hold that the presumption of prejudice arising from such eavesdropping is rebuttable.

We now turn to the question of the burden of proof in such a situation and hold that the State has the burden to show beyond a reasonable doubt that the defendant was not prejudiced. *State v. Granacki*, 90 Wn. App. 598, 602 n.3, 959 P.2d 667 (1998) ("A trial court's decision to dismiss an action based on *State v. Cory* and under CrR 8.3(b) is reviewed for abuse of the court's discretion. *State v. Starrish*, 86 Wn.2d 200, 209, 544 P.2d 1 (1975). Even under CrR 8.3(b), the burden is on the State to prove beyond a reasonable doubt that there was no prejudice to the defendant."). The constitutional right to privately communicate with an attorney is a foundational right. We must hold the State to the highest burden of proof to ensure that it is protected.

The State argues that the defendant should have the burden to show prejudice when the information is not communicated to the prosecutor. We disagree. The State is the party that improperly intruded on attorney-client conversations and it must prove that its wrongful actions did not result in prejudice to the defendant. Further, the defendant is hardly in a position to show prejudice when only the State knows what was done with the information gleaned from the eavesdropping. The proper standard the trial court must apply is proof beyond a reasonable doubt with the burden on the State.

Here, the record is unclear as to what standard the trial judge applied. When evaluating the eavesdropping, the trial judge commented that it was egregious misconduct but then stated, "I do not believe it affected the trial and I'm not satisfied that it will affect, sufficiently, well, that it has affected the motion for a new trial. I'm going to deny the motion to dismiss on that basis." 3 VRP at 593-94. On this record, there is no way to be sure of the standard applied by the trial judge. Therefore, we remand for the trial court to consider whether the State has proved the absence of prejudice beyond a reasonable doubt.

B.     *Additional Discovery Is Needed To Determine Whether the Eavesdropping Resulted in Prejudice to Peña Fuentes*

The prosecutor argues that Peña Fuentes cannot show prejudice resulting from the eavesdropping because (1) the eavesdropping occurred after trial, so the actual trial could not have been affected, and (2) the prosecutor never had any knowledge of

the content of the conversations, so the posttrial motions could not have been affected. Peña Fuentes counters that the overheard conversations included discussions regarding the posttrial motions and that since Detective Johnson was engaged in an investigation related to the posttrial motions at the same time that he had access to the tapes of the attorney-client conversations, his investigation may have been aided by his eavesdropping. Because the State holds all of the information regarding the eavesdropping and any results thereof, Peña Fuentes cannot make any showing of prejudice (or rebut the State's arguments regarding lack of prejudice) without discovery of information related to the eavesdropping.

Under CrR 4.7(e)(1), a court may require disclosure of any relevant information that is both material and reasonable. Here, the trial court's decision rested entirely on the State's representations as to the prosecutor's knowledge of the content of the eavesdropped conversation. Notably, however, the State made no representations as to the date that Detective Johnson eavesdropped on the conversations or whether he continued his investigation after that date—the State only submitted evidence showing that Detective Johnson discontinued his participation in the investigation after he disclosed the eavesdropping to the prosecutor on January 5, 2011. The key pieces of evidence at issue in the posttrial motions were the videotape of L.P. and her later declaration to the prosecutor stating that everything in the videotape was a lie. The declaration was apparently facilitated by Detective Johnson,

and it was taken on December 28, 2010—two days after the tapes were delivered to him. But we do not know whether Detective Johnson listened to the tapes while actively seeking evidence related to the posttrial motions. That is where the possibility of prejudice arises because regardless of whether the prosecutor himself knew of the content of the conversations, he may have relied on evidence gathered by Detective Johnson as part of an investigation aided by the eavesdropping.

On this record, there is no way to know whether Detective Johnson's investigation and actions were affected by what he may have overheard when eavesdropping. The State provides no evidence regarding Detective Johnson's investigation; it contends only that the information did not pass directly from Detective Johnson to the prosecutor. In this situation, Peña Fuentes must be allowed discovery in order to determine whether Detective Johnson continued to investigate after eavesdropping. Such evidence is crucial to the determination of whether Peña Fuentes was prejudiced. Because such discovery is necessary to determine prejudice, we reverse the trial judge's decision to deny discovery and remand for further proceedings.

C.    *The Court of Appeals Properly Held That the Defense Failed To Object at Trial to the Decision To Limit Consideration of L.P.'s Letter to Impeachment*

At trial, the judge allowed L.P.'s letter to be admitted solely for purposes of assessing L.P.'s credibility. He instructed the jury not to consider the letter for the truth of the matter asserted within. Peña Fuentes now contends that it was legal error

for the trial judge to admit the letter only for impeachment purposes, and not as a recorded recollection under ER 803(a)(5). We affirm the trial judge's decision to limit consideration of L.P.'s letter because the defense (1) failed to properly object at trial and (2) did not properly bring an ineffective assistance of counsel claim for the failure to object.

An error of law is grounds for a new trial if the defendant objected at the time. CrR 7.5(a)(6). The Court of Appeals correctly noted that Peña Fuentes failed to object at trial. In response, Peña Fuentes contends that the failure to object at trial constituted ineffective assistance of counsel. However, as the Court of Appeals noted, Peña Fuentes failed to assign error based on ineffective assistance of counsel in his appeal and further failed to provide any analysis of the test for ineffective assistance of counsel. Peña Fuentes now contends that the decision to not assign error was made deliberately by appellate counsel out of deference to the trial attorney, who had cancer at the time of the appeal. Nonetheless, he still fails to provide any analysis applying the test for ineffective assistance of counsel. We affirm both the trial court and the Court of Appeals on this issue.

D.   *Peña Fuentes's Convictions Did Not Violate Double Jeopardy*

The jury convicted Peña Fuentes of first degree rape of a child (count I) and two counts of first degree child molestation (counts III and IV) for conduct occurring between January 1, 2003 and November 25, 2005. The jury instructions for the child

molestation charges (counts III and IV) stated that the State must prove that the conduct occurred on separate and distinct occasions. The instructions for the child rape charge (count I) did not include an instruction that the conduct must have occurred on an occasion separate and distinct from the child molestation charges. Peña Fuentes moved for a new trial, arguing that the jury could have convicted him of child rape based on one of the same incidents that formed the basis for the child molestation convictions. The trial judge agreed and granted a new trial on the child rape charge.[2] The trial judge ruled that there was a possibility that the jurors could have convicted Peña Fuentes of first degree rape of a child based on one of the same incidents that formed the basis for his conviction for first degree child molestation. Given the way the jury was instructed, if this were the case, the conviction would

---

[2] The trial judge granted a new trial on the child rape charge, but then ordered that that charge be dismissed with prejudice because of the police eavesdropping. The trial judge essentially ruled that while the eavesdropping did not prejudice the defendant as to the charges for which he had already been tried, it did prejudice the defendant with regard to a new trial.

have violated Peña Fuentes's double jeopardy rights.[3] The Court of Appeals reversed

that ruling, *Peña Fuentes*, No. 66708-4-I, slip op. (unpublished portion) at 15, and

Peña Fuentes challenges that reversal.

A "defendant's double jeopardy rights are violated if he or she is convicted of

offenses that are identical both in fact and in law." *State v. Calle*, 125 Wn.2d 769,

777, 888 P.2d 155 (1995) (citing *State v. Johnson*, 96 Wn.2d 926, 933, 639 P.2d 1332

(1982)). "However, if each offense, as charged, includes elements not included in the

other, the offenses are different and multiple convictions can stand." *Id.* (citing *In re*

*Pers. Restraint of Fletcher*, 113 Wn.2d 42, 49, 776 P.2d 114 (1989)). Of course, if

each count arises from a separate and distinct act, the defendant is not potentially

exposed to multiple punishments for a single act. *See State v. Mutch*, 171 Wn.2d 646,

661-63, 254 P.3d 803 (2011). On review, the court may consider insufficient

instructions "in light of the full record" to determine if the instructions "actually

---

[3] In this case, the jury was instructed that sexual contact for the purposes of child molestation included "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party or a third party." CP at 45 (Instruction 20). Sexual intercourse for the purposes of rape included "any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another." *Id.* at 34 (Instruction 9). These two elements are substantially identical. These instructions appear to be drawn on pattern jury instructions drafted by the Washington Supreme Court Committee on Jury Instructions. *See* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 45.01, at 831, 45.07, at 839 (3d ed. 2008). We note that the committee on jury instructions recommended not using both definitions in a case where rape was charged, perhaps to avoid the situation we have here. *Id.*

effected a double jeopardy error." *Id.* at 664. This court has refused to find error when it is "manifestly apparent to the jury that each count represent[s] a separate act." *Id.* at 665-66.

In *Mutch*, the defendant was convicted of five separate counts of rape based on five acts that occurred with the same victim over the course of one night and the following morning. *Id.* at 655. A detective testified that the defendant admitted to engaging in multiple sex acts, and the defendant did not argue insufficiency of evidence as to the number of alleged criminal acts or question the victim's credibility regarding the number of rapes. *Id.* at 665. This court found that the jury knew that each count represented a separate act and that no double jeopardy violation occurred. *Id.* at 665-66. In another case, this court found that a "pattern of molestation and rape" that spanned several years was sufficient to support multiple counts of child molestation and child rape. *State v. French*, 157 Wn.2d 593, 612, 141 P.3d 54 (2006).

In this case, the record reveals that the jury instructions did not actually effect a double jeopardy violation. It is manifestly apparent that the convictions were based on separate acts because the prosecution made a point to clearly distinguish between the acts that would constitute rape of a child and those that would constitute child molestation. At trial, the defendant did not challenge the number of incidents or whether they overlapped, but rather he chose the strategy of attacking J.B.'s credibility.

19

In the prosecutor's closing argument, he addressed count I (child rape) and identified the two specific acts that occurred at the condo that supported a child rape conviction. 3 VRP at 553 (describing alleged conduct in detail). The prosecutor then addressed counts III and IV, which involved child molestation that occurred during the same time period as count I. *Id.* at 553-54 (describing different alleged conduct in detail). The prosecutor clearly used "rape" and "child molestation" to describe separate and distinct acts. He divided Peña Fuentes's behaviors into two categories— the acts involving penetration, which constituted rape, and the other inappropriate acts, which constituted molestation. And again, the defendant did not challenge the number of acts or whether the acts overlapped; he challenged only J.B.'s believability. The jury ultimately believed J.B.'s testimony regarding the various acts that occurred at the condo.

On this record, it is clear that the rape count was exclusively based on the two specific acts of penetration, and the molestation counts were exclusively based on the inappropriate behavior other than those two acts of penetration. Because of the clarity in the prosecutor's closing argument, we believe it is "manifestly apparent" that the jury convicted Peña Fuentes based on separate and distinct acts. We affirm the Court of Appeals' decision (albeit for different reasoning) to reverse the trial court's double jeopardy ruling.

E.     *The Court of Appeals Correctly Struck the Supplemental Clerk's Papers*

Peña Fuentes argues that the Court of Appeals erroneously struck the

supplemental clerk's papers he filed, which included the complaint he submitted to

the sheriff's department regarding Detective Johnson's conduct and the response. We

affirm the Court of Appeals' decision to strike the supplemental clerk's papers

because (1) it was not inequitable to decide the case without the documents and (2) it

is unlikely the documents would have changed the decision.

RAP 9.11 sets out the six requirements for when additional evidence can be

considered on review. Peña Fuentes did not address RAP 9.11 in his brief to the

Court of Appeals. In his briefs to this court he addresses only two of the RAP 9.11

requirements, contending that "the additional evidence would probably change the

decision being reviewed," and that "it would be inequitable to decide the case solely

on the evidence already taken in the trial court." RAP 9.11(a)(2), (6). Peña Fuentes

reasons that the most compelling basis for his charges to be dismissed is the failure of

the sheriff's department to acknowledge that misconduct occurred, and thus the

complaint he filed and the sheriff's department's response are essential to the record.

The Court of Appeals was correct to strike the additional evidence. First, Peña

Fuentes still fails to address the other four requirements of RAP 9.11. Second, the

sheriff's department's response is unnecessary to the legal analysis in this case, where

the court must determine the consequences of the State's actions in relation to Peña

Fuentes's criminal case—not whether there are consequences to Detective Johnson personally. We affirm the Court of Appeals on this issue.

## CONCLUSION

We are appalled that we must again reiterate that the State *cannot eavesdrop on private conversations between a defendant and counsel.* We recognize that the prosecutor acted promptly and ethically to remedy and disclose the violation once it was discovered by him. Nonetheless, except in rare circumstances, we will vacate convictions when such unconstitutional actions have been taken. In this case, we reverse and remand with instructions that the State has the burden of proving beyond a reasonable doubt that no prejudice occurred. On remand, Peña Fuentes must be allowed discovery related to the eavesdropping to allow him to respond to the State's arguments regarding prejudice. On all other issues we affirm the Court of Appeals.

Owens, J.

WE CONCUR:

Madsen, C.J.

Fairhurst, J.

Stephens, J.

Wiggins, J.

González, J.
result only

Korsmo, J.P.T.