IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84477-6-I |
| Respondent, | |
| v. | DIVISION ONE |
| BRETT HAROLD GRIMNES, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — Brett Grimnes appeals a jury verdict finding him guilty of robbery in the first degree with a deadly weapon enhancement. On appeal, Grimnes contends that (1) the trial court erred by denying his CrR 8.3(b) motion to dismiss after a jail guard read his confidential trial preparation materials, (2) that the court violated his constitutional rights by failing to conduct an individualized determination as to whether restraints were necessary at each pretrial proceeding, (3) that the prosecutor committed misconduct during cross-examination of Grimnes's expert witness, and (4) that the combined effect of these errors denied Grimnes a fair trial. He also contends that the court erred by requiring Grimnes to submit to a mental health evaluation as a condition of community custody and by imposing a victim penalty assessment (VPA). We affirm the convictions. However, we agree that the court erred by requiring the mental health evaluation and imposing the VPA and remand for the court to strike both from the judgment and sentence.

On cross-appeal, the State maintains that the trial court erred by concluding that Grimnes's prior Montana conviction was not factually similar to a prior Washington conviction. Because the facts admitted in the Montana case are insufficient to satisfy the elements of the Washington offense, we agree with the trial court and affirm its ruling.

FACTS

On May 7, 2021, Brett Grimnes entered an AM/PM convenience store carrying a metal wrench and proceeded to break items in the store, shout loudly, and push the store cashier. As Grimnes left the store, he took several bottles of Gatorade and then picked up a gallon bottle of water and threw it at the cashier. Law enforcement arrived shortly thereafter and apprehended Grimnes. Grimnes was later charged with robbery in the first degree with a deadly weapon enhancement.

At Grimnes's initial appearance, the State requested that he be restrained, citing his criminal history, the nature of the offense, and his behavior in custody as compelling reasons justifying restraints. The trial court granted the State's request, noting that Grimnes would be shackled at further proceedings given the nature of his criminal history and the crimes charged in the present case. The court also noted Grimnes could move for reconsideration of the court's decision.

About a year later, in April 2022, Grimnes moved to proceed pro se and to waive his right to counsel. Following a colloquy with the trial court, Grimnes's request to proceed pro se was granted. Over Grimnes's objection, the court also appointed standby counsel to assist with his defense.

Over the next few months, during pretrial proceedings, Grimnes twice complained about the restraints or asked that they be removed. Despite Grimnes's comments and requests, the court denied his request to remove the restraints. However, before voir dire began, the court ordered that Grimnes would not be restrained in front of the jury.

In August 2022, Grimnes moved to dismiss the charges against him. In his motion, Grimnes alleged that after a meeting with his standby counsel and investigator, jail guards had opened and read confidential legal mail from his investigator. The trial court held an evidentiary hearing on the motion. At the evidentiary hearing, the court heard testimony from the defense investigator, two jail deputies, both prosecutors assigned to the case, the lead investigating law enforcement officer, and Grimnes.

The trial court ultimately denied Grimnes's motion. After summarizing the testimony from the hearing, the court found that the jail deputies' review of the documents was "a reasonable review of the record[s], and very, apparently brief." The court also found that even if the jail deputy read part of the documents, the jail's policy of checking all mail for safety purposes, even legal mail, was reasonable. The court concluded that no Sixth Amendment[1] violation of Grimnes's right to confer privately with his counsel occurred.

The case proceeded to trial and a jury convicted Grimnes as charged. Before sentencing, the State submitted a memorandum and declaration contending that this conviction was a third strike offense. The State maintained

---

[1] U.S. CONST. amend. VI.

3

that Grimnes's Montana conviction for aggravated assault was factually comparable to an earlier Washington conviction for assault in the second degree. The court determined that the two convictions were not factually comparable and imposed a standard range sentence of 84 months.

Grimnes appeals.

## ANALYSIS

### CrR 8.3(b) Motion to Dismiss

Grimnes contends that the jail deputies violated his Sixth Amendment right to confer privately with his counsel by reading his confidential legal materials and therefore, that the trial court erred by denying his CrR 8.3(b) motion to dismiss.

CrR 8.3(b) provides that the trial court "may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect[s] the accused's right to a fair trial." Dismissal of charges under CrR 8.3(b) is an " 'extraordinary remedy.' " State v. Rohrich, 149 Wn.2d 647, 658, 71 P.3d 638 (2003) (quoting State v. Baker, 78 Wn.2d 327, 332, 474 P.2d 254 (1970)).

To prevail on a CrR 8.3(b) motion to dismiss, a defendant must show by a preponderance of the evidence (1) arbitrary action or governmental misconduct and (2) prejudice affecting the defendant's right to a fair trial. State v. Kone, 165 Wn. App. 420, 432-33, 266 P.3d 916 (2011). The governmental misconduct does not need to be of an evil nature; simple mismanagement is sufficient. State v. Blackwell, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993). "However, the

defendant must show actual prejudice, not merely speculative prejudice[,] affected [their] right to a fair trial." Kone, 165 Wn. App. at 433.

"We review the trial court's decision to deny a motion to dismiss under CrR 8.3 for abuse of discretion, that is, whether the decision was manifestly unreasonable, based on untenable grounds, or made for untenable reasons." Kone, 165 Wn. App. at 433.

Here, Grimnes's CrR 8.3(b) motion was premised on an alleged Sixth Amendment violation. To determine whether a Sixth Amendment violation occurred, we look to whether (1) a state actor participated in the infringing conduct alleged by the defendant; (2) if so, whether the state actor(s) infringed on a Sixth Amendment right of the defendant; (3) if so, whether prejudice to the defendant resulted, that is whether the State failed to overcome the presumption of prejudice arising from the infringement by not proving the absence of prejudice beyond a reasonable doubt; and (4) if so, what the appropriate remedy is to select and apply, considering the totality of the circumstances. State v. Irby, 3 Wn. App. 2d 247, 252-53, 415 P.3d 611 (2018).

1. State Actor

The first prong is not at issue because neither party disputes that the jail deputies were state actors.

2. Jail Deputies' Conduct

We must next determine whether the jail deputies' conduct infringed on Grimnes's Sixth Amendment rights. We conclude that it did not because the jail

5

deputies followed appropriate procedures when inspecting the envelope for contraband, and the documents in question were not privileged communications.

"The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel, which includes the right to confer privately with that counsel." State v. Peña Fuentes, 179 Wn.2d 808, 811, 318 P.3d 257 (2014); U.S. CONST. amend. VI. "State intrusion into those private conversations is a blatant violation of a foundational right." Peña Fuentes, 179 Wn.2d at 811. "Plainly, a defendant's Sixth Amendment right to assistance of counsel is violated when the State intrudes into a privileged attorney-client communication. By implication, a defendant's Sixth Amendment right is not necessarily infringed on when the attorney-client information acquired by the State is not privileged." Irby, 3 Wn. App. 2d at 254.

Criminal defendants also have "an explicit right to self-representation under the Washington Constitution and an implicit right under the Sixth Amendment to the United States Constitution." State v. Madsen, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). Where standby counsel is appointed, statements between a pro se defendant and standby counsel are privileged. State v. McDonald, 143 Wn.2d 506, 511, 22 P.3d 791 (2001). This privilege, along with the work-product doctrine, protects communications between a pro se defendant and standby counsel to the extent that such communications contain the opinions, theories, or conclusions of the attorney or investigating agencies. State v. Pawlyk, 115 Wn.2d 457, 477, 800 P.2d 338 (1990) (discussing privileged communications); State v. Bebb, 108 Wn.2d 515, 525, 740 P.2d 829 (1987)

6

(regarding pro se defendants); see also CrR 4.7(f)(1).  But the privilege does not shield facts from discovery, even if they are transmitted in communications between an attorney and client.  Youngs v. PeaceHealth, 179 Wn.2d 645, 653, 316 P.3d 1035 (2014) ("Facts are proper subjects of investigation and discovery, even if they are also the subject of privileged communications.").

Further, although incarcerated persons have a Sixth Amendment right to confidential attorney-client communications, that right must be balanced against jail officials' need to maintain safety and security at the jail facility.  Wolff v. McDonnell, 418 U.S. 539, 576-77, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974); see also Nordstrom v. Ryan, 762 F.3d 903, 910 (9th Cir. 2014).  For this reason, jail staff may not read legal mail, but they may inspect it to determine if contains contraband or poses a threat to jail safety.  Wolff, 418 U.S. at 577.

a. *Whether Jail Deputies' Opening of Grimnes's Mail Infringed*

*His Sixth Amendment Right to Counsel*

We must first address whether the jail deputies' opening of Grimnes's correspondence infringed on his Sixth Amendment right to confer privately with his counsel.  We conclude that it did not.

Testimony about the jail's procedure for reviewing incoming mail indicates that jail deputies followed the standard procedure of checking for contraband and did not unnecessarily pry into Grimnes's materials.  During the evidentiary hearing on Grimnes's motion to dismiss, Sergeant Theresa Dorcy testified about the jail's policy of searching and processing mail.  She explained that legal mail and discovery materials are typically labeled as such by the sender and, per jail

policy, are set aside by jail staff. Legal mail is opened by jail staff in front of the inmate, checked for contraband, and then handed to the inmate without staff reading it. Discovery materials are similarly handled. Discovery materials are stored in a secure room until an inmate requests to see their documents. At that point, the inmate is brought to the secure room at which time jail staff take the requested material out of the envelope and hand it to the inmate. Inmates are not permitted to take discovery materials with them due to security risks. Like with legal mail, jail staff check envelopes labeled as discovery for contraband but do not read the materials inside. If jail staff cannot determine from the envelope if mail is legal mail or discovery materials, jail policy is for staff to stop scanning the contents as soon as they recognize a document is legal mail. Attorneys and investigators visiting clients at the jail sign an acknowledgement of the procedures for seeing someone in jail at each visit; the discovery policy is one of the procedures described on the form.

Sergeant Dorcy testified that after a meeting between Grimnes and his standby counsel and investigator in one of the jail's meeting rooms, she called for Deputy Sherry Kness, a classifications deputy who handles mail for pro se inmates, to process an unmarked, unsealed manila envelope given to Grimnes by his investigator. Sergeant Dorcy recalled that Deputy Kness "opened [the envelope] in less than five seconds and said that it needed to go into [Grimnes's] discovery."

Deputy Kness testified to the same set of facts. She testified that she was called to review the materials in the unmarked envelope before Grimnes could

take them out of the room. Deputy Kness explained that, per jail policy, classifications deputies are allowed to skim some of the material to determine what type of document it is. She testified that before she picked up the envelope, Grimnes told her that the envelope contained "legal confidential information." After looking at the documents for "[p]robably five seconds or less," Deputy Kness concluded that the documents were neither legal mail nor discovery. She noted that the documents looked "like a commissary order." Deputy Kness told Sergeant Dorcy that Grimnes could take the documents but Grimnes informed them that he did not want them. Deputy Kness commented that if the documents were discovery materials, they would need to go to the secure discovery room. Grimnes replied, "[I]t's not discovery. You can just take it." Deputy Kness then wrote Grimnes's name on the envelope and the word "discovery."

Grimnes's defense investigator Lana Reichert testified that, at some point during her meeting with Grimnes, she handed him an unsealed, unmarked manila envelope. Despite being familiar with the jail's policies, Reichert testified that she did not label the envelope as legal mail or as discovery materials. Reichert then explained that the envelope contained four pages of documents received through a subpoena duces tecum from Mark Hill, the Department of Social and Health Services (DSHS) Electronic Benefits Transfer (EBT) records physical manager, and sent via e-mail. Reichert also testified that there were no handwritten notes, no attorney communications, and no communications from her written on or attached to the documents.

Grimnes testified that Deputy Kness read portions of the documents "out

9

loud" to Sergeant Dorcy and another jail staffer. He also stated that the incident undermined his confidence in his ability to communicate with his investigator and standby counsel.

Given the context and surrounding circumstances, we conclude that the jail deputies did not violate Grimnes's Sixth Amendment right to confer privately with his counsel by checking his mail for contraband. Testimony from Sergeant Dorcy and Deputy Kness supports the court's finding that the jail staff followed procedure and only opened the envelope to check for contraband. Because the envelope was unmarked and unsealed, it was reasonable for the jail deputies to do so. Also, Deputy Kness's review of the documents was so short that she would not have gained anything of significance from these particular documents. Deputy Kness's short review indicates that she was following procedure by briefly scanning the documents in order to properly characterize the kind of documents left behind. Given these circumstances, we conclude that no Sixth Amendment violation occurred.

### b. Whether the Documents Were Privileged

We must next address whether the information exposed to the scrutiny of the jail deputies included privileged attorney-client communications. Neither party disputes that the communication between Grimnes and his defense investigator was privileged based on the context of the meeting. We must determine then, whether the records at issue were privileged communications. We conclude that they are not.

10

The records at issue, a list of Grimnes's EBT transactions, were facts and did not reveal any privileged information about his defense or trial strategy. Grimnes's assertion that the documents were prepared in anticipation of litigation is also unavailing. The records were prepared by the DSHS, which routinely prepares and maintains public records related to the programs it administers. WAC 388-01-030. Moreover, none of the documents in the envelope had notes from Grimnes, his defense investigator, or his standby counsel. Because the documents did not contain communications from standby counsel or the investigator, they were not privileged. Therefore, we conclude that the trial court did not abuse its discretion in denying Grimnes's motion to dismiss.

3. Prejudice

Because the state actors at issue here did not infringe on Grimnes's Sixth Amendment right, we disagree with Grimnes that any prejudice resulted. But even if the jail guards' conduct did constitute a Sixth Amendment violation, the State has still proved the absence of prejudice beyond a reasonable doubt.

The testimony from the evidentiary hearing is sufficient to meet this burden. Deputy Kness testified that she looked at the documents for "[p]robably five seconds or less" and that she followed the jail's policy for examining legal mail and discovery materials. She also testified that she did not tell anybody what was contained in the documents. Sergeant Dorcy testified that Grimnes told her and Deputy Kness that the documents were not discovery and that they could keep the documents. Both prosecutors assigned to Grimnes's case testified that they did not know what was in the envelope, that no one from the jail

told them about the documents, and that law enforcement never discussed the documents in question with them. The lead law enforcement investigator also testified that he did not know what the documents in the envelope were and that he was only made aware that Grimnes had allegedly had legal mail taken from him when he was subpoenaed to appear in court. Because no one involved in Grimnes's prosecution knew anything about the documents, the State met its burden of proving Grimnes was not prejudiced beyond a reasonable doubt. And because Grimnes was not prejudiced, the court did not err by denying his CrR 8.3(b) motion to dismiss.[2]

### 4. Evidentiary Hearing

Grimnes also asserts that the evidentiary hearing held by the court to determine whether a Sixth Amendment violation occurred was an additional violation of his confidentiality. We disagree.

When a defendant raises a Sixth Amendment violation on a CrR 8.3(b) motion to dismiss, an evidentiary hearing is proper to determine whether such a violation occurred. See Irby, 3 Wn. App. 2d at 263 (remanding for evidentiary hearing on CrR 8.3 motion to dismiss); Peña Fuentes, 179 Wn.2d at 822 (discussing importance of discovery and factfinding to determine

---

[2] In its reply brief as cross-appellant, the State offered additional argument on the Sixth Amendment issue. Grimnes subsequently moved to strike the portion of the State's reply brief that addressed this issue, arguing that it is not an issue raised on cross appeal. RAP 10.1(c) provides that "[i]f the respondent is also seeking review, the respondent may file a brief in reply to the response the appellant or petitioner has made to the issues presented in the respondent's review." Because the State did not raise a Sixth Amendment issue in its cross appeal, we agree that the portion of the State's reply brief addressing the Sixth Amendment issue should be stricken.

prejudice); State v. Garza, 99 Wn. App. 291, 301-02, 994 P.2d 868 (2000) (noting need for specific factfinding to determine whether constitutional violation occurred and if prejudice resulted).

Here, the trial court properly conducted an evidentiary hearing after Grimnes moved to dismiss on the grounds of government misconduct. The evidentiary hearing was not a violation of Grimnes's confidentiality.

Restraints at Pretrial Hearings

Grimnes asserts that the trial court violated his constitutional rights by forcing him to appear in restraints during pretrial proceedings without conducting an individualized inquiry at each appearance. Grimnes also argues that the State cannot establish beyond a reasonable doubt that the unconstitutional use of restraints was harmless. Although it is unclear whether Grimnes was shackled at all pretrial proceedings, the record clearly reflects that Grimnes was shackled at some proceedings and the court failed to conduct an individualized inquiry. But because Grimnes fails to demonstrate how being restrained at some of the proceedings resulted in prejudice, we conclude that though the restraint was unconstitutional, the error was harmless.

A criminal defendant's right to a fair trial is protected by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution. State v. Jackson, 195 Wn.2d 841, 852, 467 P.3d 97 (2020). "It is well settled that a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances." State v. Finch, 137 Wn.2d 792, 842, 975 P.2d 967

(1999) (plurality opinion). This constitutional right to a fair trial is also implicated by restraints at nonjury pretrial hearings. Jackson, 195 Wn.2d at 852. But the right to be free from restraints is not absolute; trial judges are vested with discretion to determine measures that implicate courtroom security, such as whether to restrain a defendant. State v. Hartzog, 96 Wn.2d 383, 396, 400, 635 P.2d 694 (1981). Therefore, "[a] trial court must engage in an individualized inquiry into the use of restraints prior to every court appearance" to determine whether the restraints are necessary. Jackson, 195 Wn.2d at 854 (emphasis omitted).

We review a trial court's decision of whether to shackle a defendant for an abuse of discretion. Jackson, 195 Wn.2d at 850. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

1. Whether Grimnes Was Unconstitutionally Restrained

At Grimnes's first appearance, the trial court granted the State's request that Grimnes be restrained in the courtroom because of the nature of the charges against him and his criminal history. The court's order noted that it was subject to a motion for reconsideration by Grimnes. Over a year passed between Grimnes's first appearance and the case proceeding to trial. Over the course of that year, Grimnes appeared for more than 20 pretrial hearings, either remotely or in-person. Of those proceedings, shackling was discussed or mentioned on four occasions.

On May 19, 2022, Grimnes stated: "I can request to be unshackled during these hearings so I can actually write things down and make notes and stuff. It's nearly impossible to do with the shackles on." In response, the court told Grimnes that it would address his request at the next hearing.

Then, on July 7, 2022, when asked by the court if he was ready to proceed, Grimnes replied: "I'm struggling with the restraints over here trying get my paperwork here." The court responded: "Let me know when you are ready." No further discussion of restraints took place that day.

On August 8, 2022, Grimnes inquired about whether he would be shackled during trial. The court told Grimnes that it would address that issue after they finished discussing the pretrial motions.

On August 30, 2022, the court informed Grimnes that it would not order him to be restrained at trial. The court stated: "Mr. Grimnes, I'm not going to order restraints in the courtroom before the jury. I think that has been appropriate for all the hearings pretrial, but I see no reason for that. Obviously, you will be transported down, however, by jail staff before you come in the courtroom in restraints."

Though restraints were only discussed at these four hearings, the court's comment about restraints having been appropriate for "all the hearing pretrial" indicates that Grimnes was shackled throughout pretrial proceedings. Still, Grimnes bears the burden of proving that he was unconstitutionally restrained at each of the pretrial hearings. Because restraints were not discussed at each hearing, it is unclear from the record whether Grimnes was shackled at all pretrial

15

proceedings. However, it is clear that on the two occasions that Grimnes stated he was shackled, the court did not conduct an individualized inquiry as to whether shackling was still appropriate. Because the court failed to conduct the relevant inquiry as to whether restraints were necessary, we conclude that Grimnes was unconstitutionally restrained on these occasions.

2. Harmless Error

Although Grimnes was unconstitutionally restrained, such error was harmless because Grimnes was not shackled in front of the jury and because there is no evidence that his being restrained during pretrial proceedings prejudiced the judge against him during pretrial proceedings, over the course of the trial, or at sentencing.

Once an appellant demonstrates that they were unconstitutionally restrained during a court proceeding, the State must establish that any error was harmless. Jackson, 195 Wn.2d at 855-56. To do so, the State must demonstrate, from an examination of the record, that the error was harmless beyond a reasonable doubt or that the evidence against the defendant was so overwhelming that no rational finder of fact could find the defendant not guilty. State v. Clark, 143 Wn.2d 731, 775-76, 24 P.3d 1006 (2001). Although the likelihood of prejudice is "significantly reduced" in proceedings without a jury, judges, too, are not immune from the risk of prejudice from implicit bias. State v. Lundstrom, 6 Wn. App. 2d 388, 395 n.2, 429 P.3d 1116 (2018); Jackson, 195 Wn.2d at 856 (noting that judges may be unconsciously prejudiced by seeing a defendant in restraints). There is a presumption that the trial court properly

discharged its official duties without bias or prejudice. In re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004).

   *a.  Motion to Dismiss Hearing*

Grimnes first asserts that he was unconstitutionally restrained during the hearings on his motion to dismiss and that this error was not harmless because the State cannot prove that the shackles did not affect the court's decision on the motion to dismiss. We disagree.

As an initial matter, we note that the State maintains that Grimnes failed to meet his burden to perfect the record because the record does not reflect that Grimnes was restrained at the motion to dismiss hearing. Although the record is somewhat unclear as to whether Grimnes was shackled at these hearings, the trial court's later statement that it believed restraints were necessary at all pretrial proceedings alludes to the fact that Grimnes was shackled during the hearing on the motion to dismiss. Therefore, we disagree that the record does not reflect that Grimnes was restrained at this particular hearing. We next turn to whether this unconstitutional restraint constituted harmless error.

At the August 30, 2022 hearing, the trial court determined that the jail staff's conduct in processing Grimnes's discovery materials did not violate his Sixth Amendment right to confer privately with his counsel. The record clearly supports the trial court's determination.

Over the course of a two-day evidentiary hearing, the court heard testimony about the incident from jail deputies, the prosecutors assigned to the case, the lead law enforcement officer on the case, and Grimnes. At the hearing,

Grimnes expressed concern that the jail staff could read his confidential legal materials while he prepared his case by using cameras in his cell. Despite testimony that the jail cameras did not possess the zoom capabilities to read materials in an inmate's cell, the court instructed the State to perform a simulation, with Grimnes's involvement, to confirm that jail staff could not view Grimnes's case materials via the surveillance cameras. At another hearing, the court considered the results of the simulation and determined from photo evidence that the cameras were too pixilated to see details of Grimnes's legal materials. After considering the testimony from the hearings, a video of the entire incident, and the additional evidence from the simulation, the court concluded that the jail deputy's review of Grimnes's legal materials was "so short that [the deputy] wouldn't have gained anything of significance from this particular document" and that it was "certainly reasonable" for the jail to have a policy for safety purposes to review any incoming mail. Given the court's in-depth consideration of Grimnes's motion, the record does not support that the court exhibited any bias in conducting the hearing or that its decision was negatively influenced by the fact that Grimnes was restrained. The court's decision was reasonable and we conclude that the unconstitutional restraint was harmless error.

### b. Sentencing Hearing

Grimnes next asserts that being restrained during pretrial proceedings in front of the same judge that sentenced him affected the court's decisions at his sentencing hearing. The record reflects, and the State concedes, that Grimnes

was restrained during at least two pretrial proceedings. But because no prejudice resulted, we conclude that such error was harmless.

State v. Jarvis, 27 Wn. App. 2d 87, 530 P.3d 1058, review denied, 537 P.3d 1027 (2023), is instructive here. In Jarvis, this court concluded that the defendant was unconstitutionally restrained during his sentencing hearing and that the error was not harmless. 27 Wn. App. 2d at 97-98. In its harmless error analysis, the court pointed to two decisions by the sentencing judge that could indicate potential prejudice as a result of seeing Jarvis in restraints. Id. at 102-03. The first was the sentencing court's determination that the State had proven that the two prior strike offenses were committed by Jarvis on fingerprint and photograph evidence. Id. Given the nature of the evidence and the sentencing court's role in evaluating the evidence, this court explained that the State could not prove beyond a reasonable doubt that Jarvis' appearance in restraints at sentencing had no impact on the sentencing court's determination that Jarvis had committed the two prior offenses. Id.

The second decision was the sentencing court's determination to sentence Jarvis at the top end of the standard range for the first degree unlawful possession of a firearm conviction. Id. at 102. Because that determination involved an exercise of discretion, this court noted that Jarvis' appearance in restraints at the sentencing hearing could have influenced the sentencing court's decision. Id.

Jarvis is distinguishable from the present case. Here, like in Jarvis, the State argued that Grimnes was a persistent offender and that this conviction was

a third strike offense. But unlike in <u>Jarvis</u>, the sentencing court disagreed that the State had proven the two prior strike offenses. In reaching this decision, the sentencing court had to make factual determinations, much like the court in <u>Jarvis</u>, about whether Grimnes's Montana conviction was factually comparable to his prior Washington conviction. Moreover, when Grimnes refused to appear in court for the comparability analysis hearing, the court denied the State's motion to proceed without Grimnes's presence and continued the hearing. Finally, the sentencing court here chose to sentence Grimnes to a mid-range sentence of 84 months even though the State requested the statutory maximum sentence of 92 months. The nature of the court's decisions indicates that Grimnes's appearance in restraints during pretrial proceedings had no impact on the court's sentencing determinations. Therefore, we conclude that the use of unconstitutional restraints was harmless error.

Prosecutorial Misconduct

Grimnes maintains that the prosecutor committed misconduct while cross-examining his expert witness by insinuating that Grimnes prevented his witness from accessing documents provided by the State. Because Grimnes fails to demonstrate how the prosecutor's conduct was so flagrant or ill-intentioned that a jury instruction could not have cured the resulting prejudice, he waived any error.

To prevail on a claim for prosecutorial misconduct, a defendant who timely objects must prove that the prosecutor's " 'conduct was both improper and prejudicial in the context of the entire trial.' " <u>State v. Zamora</u>, 199 Wn.2d 698, 708, 512 P.3d 512 (2022) (internal quotation marks omitted) (quoting <u>State v.</u>

Loughbom, 196 Wn.2d 64, 70, 470 P.3d 499 (2020)). But where a defendant fails to object, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). "In other words, the defendant who did not object must show the improper conduct resulted in *incurable* prejudice." Zamora, 199 Wn.2d at 709.

On cross-examination, the State asked Grimnes's expert, Dr. David Dixon, a series of questions about the expert's conclusions and the materials he relied on in making those conclusions. One line of questioning focused on whether Dr. Dixon had reviewed reports from the State about Grimnes's demeanor under the influence:

| [STATE]: | You've talked about needing a baseline. Were you provided any baseline about Mr. Grimnes while under the influence of methamphetamine? |
| [DIXON]: | No, I never observed him under the influence, just the effect of methamphetamine. |
| [STATE]: | Were you provided potential reports with that information? |
| [DIXON]: | No. |
| [STATE]: | Were you provided reports with that information from myself from my office? |
| [DIXON]: | I don't believe so. |
| [STATE]: | Okay. Were you told not to review those reports at the request of the defendant? |
| [DIXON]: | I don't believe so. |
| [STATE]: | Several hundreds of pages in an email? |
| [DIXON]: | I don't recall that. |

The State then showed Dr. Dixon a transcript of his interview with the prosecutor and asked if the transcript refreshed his recollection about receiving additional information. Dr. Dixon indicated that it did not refresh his recollection. The State then asked Dr. Dixon again whether the expert had reviewed the additional information from the prosecutor's office. Dr. Dixon indicated that he did not believe so and that he could not recall. The State then asked Dr. Dixon whether Grimnes had requested he change his expert report. Grimnes did not object to this line of questioning or to any of the State's questions about the additional records.

Considered in the context of the entire trial, these questions were not so flagrant or ill-intentioned as to result in incurable prejudice. Rather, these questions were part of a larger series of questions meant to assess the credibility of Dr. Dixon and the basis and reliability of his report. When Dr. Dixon indicated he did not recall parts of his interview with the prosecutor, the State attempted to impeach him with a transcript of that interview. But when Dr. Dixon indicated that the transcript did not help him refresh his recollection, the State moved on to ask the witness other questions. It appears that the purpose of this brief exchange during cross-examination was not, as Grimnes asserts, to mislead the jury into believing that there were hundreds of pages of reports about Grimnes's past behavior while using methamphetamine or that Grimnes had intentionally prevented Dr. Dixon from considering that information. Instead, the purpose of this questioning was to impeach the witness after he testified that he could not recall whether he reviewed any additional records from the prosecutor and that

he did not recall any direction from Grimnes about the records. The prosecutor's conduct was not so flagrant or ill-intentioned that a jury instruction could not have cured the resulting prejudice and therefore, we conclude that Grimnes waived any error related to the prosecutor's conduct.

## Cumulative Error

Grimnes contends that he is entitled to a new trial because the cumulative effect of all his asserted errors denied him a fair trial. We disagree.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." Emery, 174 Wn.2d at 766. Cumulative error "is limited to instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).

Here, Grimnes being unconstitutionally restrained at some pretrial proceedings is the only error. But because we determined this error to be harmless, we also conclude that reversal is not appropriate under the cumulative error doctrine.

## Community Custody

Grimnes asserts that the court erred by requiring him to submit to a mental health evaluation as a condition of community custody without first making findings that Grimnes is a mentally ill person. Grimnes argues that the requirement that he submit to an evaluation should be stricken from the judgment

and sentence. The State does not oppose remand to strike the evaluation provision.

A court may order a mental health evaluation only if it finds "that reasonable grounds exist to believe that the offender is a mentally ill person as defined in RCW 71.24.025, and that this condition is likely to have influenced the offense." RCW 9.94B.080.

Here, neither party disputes that the court made no such finding and that remand is appropriate to strike the evaluation requirement from the judgment and sentence. We agree that remand is necessary to correct the judgment and sentence.

Victim Penalty Assessment

Grimnes argues that the trial court erred in imposing a victim penalty assessment because it found him to be indigent. The State does not oppose remand for Grimnes to move to strike the assessment.

As of July 1, 2023, trial courts may no longer impose the crime victim penalty assessment on indigent defendants. Former RCW 7.68.035 (2018), amended by LAWS OF 2023, ch. 449, § 1(4). This change in statute applies prospectively to defendants whose cases are not yet final, including those whose cases are pending on appeal. State v. Ramirez, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

Here, neither party disputes that Grimnes is indigent and that remand is proper for Grimnes to move to strike the assessment. We agree that remand is appropriate.

Montana Conviction

On cross-appeal, the State asserts that the trial court erred by determining that Grimnes's Montana conviction for aggravated assault was not factually comparable to his prior Washington conviction for assault in the second degree. We disagree. Because the elements of the Montana offense are broader than those of the Washington offense and because Grimnes's guilty plea did not stipulate or admit facts that would satisfy the Washington offense, the trial court correctly determined that the Montana conviction was not comparable.

The Sentencing Reform Act of 1981, chapter 9.94A RCW, creates a grid of standard sentencing ranges calculated based on a defendant's offender score and the seriousness level of the current offense. RCW 9.94A.505, .510, .520, .525; State v. Olsen, 180 Wn.2d 468, 472, 325 P.3d 187 (2014). A defendant's offender score is the sum of points accrued as a result of their prior convictions. RCW 9.94A.525. We review de novo a sentencing court's calculation of an offender score. State v. Bergstrom, 162 Wn.2d 87, 92, 169 P.3d 816 (2007).

Out-of-state convictions for offenses may be included in the offender score calculation and must "be classified according to the comparable offense definitions and sentences provided by Washington law." RCW 9.94A.525(3). Only comparable out-of-state convictions can be included in the offender score. State v. Thiefault, 160 Wn.2d 409, 415, 158 P.3d 580 (2007). The State bears the burden of proving by a preponderance of the evidence the existence and comparability of all out-of-state convictions. Olsen, 180 Wn.2d at 472.

We employ a two-part analysis to determine whether an out-of-state conviction is comparable to a Washington conviction. Thiefault, 160 Wn.2d at 414-15. First, we determine whether the convictions are legally comparable by comparing the elements of the out-of-state conviction to the relevant Washington statute. Thiefault, 160 Wn.2d at 415. If the out-of-state conviction is identical to or narrower than the Washington statute and contains all the most serious elements of the Washington statute, then the out-of-state conviction is legally comparable and counts toward the offender score. Thiefault, 160 Wn.2d at 415. But if the out-of-state statute is broader than the Washington statute, the offenses are not legally comparable. In re Pers. Restraint of Lavery, 154 Wn.2d 249, 258, 111 P.3d 837 (2005).

Second, even if the offenses are not legally comparable, the out-of-state conviction may still be included in the offender score if the offenses are factually comparable. Thiefault, 160 Wn.2d at 415. To determine if the offenses are factually comparable, we analyze whether the defendant's conduct underlying the out-of-state conviction would have violated the comparable Washington statute. Thiefault, 160 Wn.2d at 415. The sentencing court may "look at the defendant's conduct, as evidenced by the indictment or information, to determine if the conduct itself would have violated a comparable Washington statute." Lavery, 154 Wn.2d at 255. "In making this factual comparison, the sentencing court may rely on facts in the out-of-state record only if they are admitted, stipulated to, or proved beyond a reasonable doubt." State v. Arndt, 179 Wn. App. 373, 379, 320 P.3d 104 (2014). The elements of the charged

26

crime remain the cornerstone of this inquiry. Arndt, 179 Wn. App. at 379. In the factual comparability analysis, the court may only consider facts which are admitted or proved beyond a reasonable doubt in the out-of-state conviction. Lavery, 154 Wn.2d at 258.

If the out-of-state conviction is neither legally nor factually comparable to a Washington offense, it may not be included in the defendant's offender score. Thiefault, 160 Wn.2d at 415.

Here, the State concedes that Grimnes's Montana conviction is not legally comparable to his Washington conviction. We must instead determine whether the two convictions are factually comparable.

Under Montana Code, "[a] person commits the offense of aggravated assault if the person purposely or knowingly causes serious bodily injury to another or purposely or knowingly, with the use of physical force or contact, causes reasonable apprehension of serious bodily injury or death in another." MCA 45-5-202. Montana defines "serious bodily injury" as bodily injury that:

> (i)  creates a substantial risk of death;
>
> (ii)  causes serious permanent disfigurement or protracted loss or impairment of the function or process of a bodily member or organ; or
>
> (iii)  at the time of the injury, can reasonably be expected to result in serious permanent disfigurement or protracted loss or impairment of the function or process of a bodily member or organ.

MCA 45-2-101(66)(a).

Under MCA 45-2-101(35), to act "knowingly" means

> a person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when the person is aware of the person's own conduct or that the

27

circumstance exists. A person acts knowingly with respect to the result of conduct described by a statute defining an offense when the person is aware that it is highly probable that the result will be caused by the person's conduct. When knowledge of the existence of a particular fact is an element of an offense, knowledge is established if a person is aware of a high probability of its existence. Equivalent terms, such as "knowing" or "with knowledge", have the same meaning.

Per RCW 9A.36.021(1)(g), a person is guilty of assault in the second degree by strangulation if they "[a]ssault[] another by strangulation or suffocation." " 'Assault is an intentional touching or striking of another person that is harmful or offensive, regardless of whether it results in physical injury.' " State v. Jarvis, 160 Wn. App. 111, 119, 246 P.3d 1280 (2011) (quoting State v. Tyler, 138 Wn. App. 120, 130, 155 P.3d 1002 (2007)). "Strangulation" is defined generally as "to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." RCW 9A.04.110(26). The plain meaning of "obstruct" in this context is to hinder or block to some degree a person's ability to breathe or to experience blood flow. State v. Rodriquez, 187 Wn. App. 922, 935, 352 P.3d 200 (2015). To "compress" means "to reduce the volume, size, duration, density, or degree of concentration of by or as if by pressure" or "to press together." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 467 (2002). And "suffocation" means "to block or impair a person's intake of air at the nose and mouth, whether by smothering or other means, with the intent to obstruct the person's ability to breathe." RCW 9A.04.110(27).

In the present case, the only facts that were admitted or stipulated to from the Montana conviction are those in Grimnes's Montana guilty plea. In the plea

28

agreement, Grimnes admitted to the following facts:

> On or about September 12, 2011, I knowingly with use of physical force, caused reasonable apprehension of serious bodily injury to my girlfriend C.K. by placing my hands around her neck and applying pressure while at our home in Billings, Yellowstone County, Montana. I further acknowledge that I knowingly struck her in the face and that it caused her injury.

From the facts admitted in Grimnes's guilty plea, it is clear that he intentionally touched another person in a harmful way that likely compressed that person's neck. But it is unclear from the plea statement whether such action actually obstructed that person's blood flow or ability to breathe or whether Grimnes intended to so do. Because it is unclear if Grimnes possessed the requisite intent or whether he obstructed another person's blood flow or ability to breathe, the facts admitted by the Montana plea statement do not satisfy the elements for assault in the second degree by strangulation. Therefore, the trial court did not err by determining that the Montana conviction was not factually comparable to the Washington conviction.

Affirmed and remanded for the trial court to remove the mental health evaluation condition from the judgment and sentence and for Grimnes to move the court to strike the VPA.

Smith, C.J.

WE CONCUR:

Coburn, J.          Mann, J.